No. 71,169

STATE OF KANSAS, *Appellant*, v. KELLEY F. GRADY, *Appellee*.

(900 P.2d 227)

Opinion filed July 14, 1995.

*Doyle Baker*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for the appellant.

*Lee Thompson*, of Triplett, Woolf & Garretson, LLP, of Wichita, argued the cause, and *Jeffrey D. Leonard*, of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is an appeal by the State from the sentence imposed following defendant Kelley Grady's jury conviction for voluntary manslaughter (K.S.A. 1994 Supp. 21-3403). The sentence imposed was a downward dispositional departure from the presumptive guidelines sentence. This appeal was transferred from the Court of Appeals on this court's order.

This case arises out of a relationship among three people, Kelley Grady (the defendant), Michael Croslin (the victim), and Brenda Croslin (the victim's wife).

The defendant separated from his wife in late 1991. At that time Michael and Brenda and their two children were living together. Brenda worked two jobs, one as a bartender. The defendant began an affair with Brenda. Brenda left Michael and began renting a home owned by the defendant's mother and managed by the defendant.

Michael and Brenda had a somewhat violent relationship. On more than one occasion Michael choked and beat Brenda in the presence of their children. Among the incidents were two occasions in July 1993, the month Michael was killed, when Michael choked Brenda and told her he was going to kill her. Another incident occurred when Michael, after a day of drinking, threw Brenda against the car, causing her to strike her head. Brenda had told the defendant about the instances of abuse. Michael also was known to have expressed his anger to others. For example, he once lifted an employee off the floor by her arms and pushed her against the doors of an oven when he was angry with her. On another occasion Michael stated that he would have to kill the defendant "someday" when the defendant admitted to Michael that he (the defendant) was in love with Brenda. The defendant was described as a peaceful, nonaggressive, nonviolent person who sought to avoid conflict.

On March 7, 1993, an incident involving Brenda, Michael, and the defendant occurred. Michael and Brenda argued on the telephone, and Michael then went to Brenda's rental house, where the defendant and Brenda's children were also present. Michael began yelling for the defendant to come out of the house and threatened to kill him. The defendant telephoned the police. After the police arrived, Michael left.

The incident giving rise to Michael's death occurred on July 20, 1993. After working until 9:00 p.m., Brenda went to Michael's house to pick up their children. When Brenda arrived, Michael began yelling at her, poking her in the chest, slapping her with his hand, and telling her that she was moving back in with him. Brenda told Michael she was not moving back in with him, and Michael became enraged. Michael called the defendant on the telephone and told him Brenda was moving out of the rental house. Michael ordered Brenda to tell the defendant herself; when Brenda would not say anything Michael got mad. The defendant heard Brenda crying in the background. Michael pushed Brenda into the living room and began punching, kicking, and choking her. Michael pushed Brenda through the wall, and her nose started bleeding from a cut. Michael and Brenda's oldest son (six years old) intervened and tried to pull Michael off Brenda. Brenda heard Michael on the telephone telling a friend to get over there before he killed her. The friend's wife, listening on an extension telephone, testified Michael asked her husband to come over to his house because "he needed him" and said he had pushed Brenda through a wall and was going to kill both Brenda and the defendant.

After his conversation with Michael, the defendant drove his truck to Brenda's rental house. Finding nobody there, the defendant drove to Michael's house, parked in front, and honked the horn. The defendant had a cellular telephone, a knife, and a semi-automatic handgun in his car. Brenda went onto the porch and told the defendant to leave. The defendant began yelling "wifebeater" and for Michael to come out of the house and pick on someone his own size. Brenda saw Michael take a knife from the kitchen. Holding the butcher knife in his right hand, Michael pushed Brenda and the children out of the way and jumped off the porch into the yard. The defendant saw Michael come out of the house with what the defendant thought was a gun. The defendant reached into his vehicle, retrieved his gun, and began shooting at Michael and running. There were three initial gunshots, a pause, and then another series of shots. Michael fell to the ground face first. The defendant threw the gun down, told Brenda to call 911, and went to his truck.

The defendant was arrested when the police arrived. He was cooperative and made a confession admitting to the events described above. The defendant did not testify at trial, but his tape-recorded confession was played for the jury.

The police discovered Michael lying face first on the ground with both hands above his head and with his right hand wrapped around the handle of a butcher knife. Michael was pronounced dead almost immediately after arriving at the hospital. An autopsy revealed 11 separate bullet wounds. One bullet entered the front left upper leg, two bullets entered the right front chest, and the other eight bullets entered the left back. A toxicology report revealed a blood alcohol concentration of .164.

The defendant was charged with one count of first-degree premeditated murder in Michael's death. The defendant claimed self-defense. The jury found the defendant guilty of voluntary manslaughter.

Prior to sentencing, the defendant filed a motion for a downward departure sentence. Based on the offense of conviction (severity level 3) and the defendant's criminal history (category I—no prior convictions), the presumptive sentence was a term of incarceration of 46-51 months. The defendant sought both a dispositional and a durational departure. He reasoned that there were substantial and compelling reasons for departure, including the following:

1. The victim was the aggressor.
2. The defendant poses no threat to public safety, and there is no need to protect the public by incarcerating the defendant.
3. The crime was motivated by and in response to the defendant's awareness of a pattern of physical abuse of Brenda Croslin by the victim.
4. The victim had previously threatened the life of the defendant, leading to the defendant's perception of fear.
5. The defendant's use of deadly force, even if excessive, was a reaction similar to that of other individuals confronted with life-threatening situations for the first time.
6. The defendant's conduct was self-defense.

7. The defendant has expressed remorse.
8. The defendant is able to compensate the victim's sons, but that ability will be diminished by imprisonment.
9. The cost of imprisonment is not justified because there is no need to protect society, whereas the State can receive an economic benefit by a nonimprisonment sentence.
10. There is no benefit to incarcerating the defendant in light of the State's efforts at reducing prison overcrowding.

The defendant requested imposition of a nonprison sentence of 36 months, including up to 30 days in jail, up to 180 days in community corrections, a period of probation, and public and monetary restitution.

The trial court sentenced the defendant to the presumptive period of incarceration of 49 months and imposed a $100,000 fine. Because the defendant was not a threat to society and in the interest of treating offenders locally where possible, the court then ordered that the sentence be served locally as follows:

1. 30 days in jail;
2. 180 days in residential Community Corrections;
3. 1 year on electronic surveillance;
4. 1,000 hours of public restitution, 4 hours per week after release from jail, $10 credit per hour;
5. supervision by Community Corrections for the duration of the 49 months;
6. no contact with the Croslin children until a review hearing by the Court;
7. payment for a psychological evaluation of the Croslin children.

The court indicated that when supervision by Community Corrections was nearly complete, an additional hearing would be held to evaluate the defendant's performance of public restitution and his ability to pay the fine. The court indicated its desire to impose the most severe "local" or nonimprisonment sentence possible. The court concluded: "[I]t amounts to a granting of the motion for departure as to disposition." While not adopting all of the defen-

dant's proposed reasons for departure, the court made the following findings of fact:

"[T]his gentleman, number one, is no threat to society. I see no evidence whatever to that effect.

"Number two, that though there wasn't sufficient evidence to exonerate him by reason of self-defense, he was being advanced upon by a man with a knife. That he made the wrong decision is not to say that it was—showed mens rea, at least in that part of the process. I hesitate to characterize Mr. Croslin's advance.

"We did hear a great deal of evidence as to his temper and his drinking, both of which I think are unmistakable. And I say that without saying he should have died or didn't have a chance to recover. I think he could have, it was, however, part of the facts of the case and of the—and that weighs on my consideration.

"He was also motivated by—I have no reason to doubt that his motivation was a concern for Brenda Croslin. His statement here today does not cut against that finding and there again without being able to get inside his head I am willing to accept that concern for Brenda Croslin was a significant factor in him going to the place, especially in light of the fact that he had been called by Mr. Croslin.

"The record does I think—again I'm not going to recite all of the things about Mr. Croslin, it's not his trial, he shouldn't have been killed and yet it was a very serious situation. Without knowing what was in Mr. Grady's mind, the objective evidence to this Court does not indicate an execution or cold-blooded killing of Mr. Croslin. And in fact the bullet going near the children tends to cut the other way."

The State timely appeals the departure sentence.

## STANDARD OF REVIEW

This appeal is pursuant to K.S.A. 1994 Supp. 21-4721. That statute provides in pertinent part:

"(a) A departure sentence is subject to appeal by the defendant or the state. . . .

. . . .

"(d) In any appeal from a judgment of conviction imposing a sentence that departs from the presumptive sentence prescribed by the sentencing grid for a crime, sentence review shall be limited to whether the sentencing court's findings of fact and reasons justifying a departure:

(1)  Are supported by the evidence in the record; and

(2)  constitute substantial and compelling reasons for departure.

"(e) In any appeal, the appellate court may review a claim that:

(1)  The sentence resulted from partiality, prejudice, oppression or corrupt motive."

Recently this court set forth our standard of review:

"A claim that sentencing guidelines departure factors are not supported by evidence in the record should be reviewed to determine whether there is substantial evidence supporting the court's findings or whether the court's findings are clearly erroneous. A claim that the departure factors relied upon by the court do not constitute substantial and compelling reasons for departure is a question of law." *State v. Gideon*, 257 Kan. 591, Syl. ¶ 20, 894 P.2d 850 (1995).

See *State v. Richardson*, 20 Kan. App. 2d 932, Syl. ¶ 1, 901 P.2d 1 (1995). Substantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *State v. Ratley*, 253 Kan. 394, Syl. ¶ 2, 855 P.2d 943 (1993).

## TRIAL COURT'S FINDINGS
### Threat to Society

The State first argues that the trial court's finding the defendant is not a threat to society is not supported by substantial evidence. The State reasons that based on the circumstances of the offense, there is evidence the defendant would be a danger to society if not incarcerated.

The State points to the following facts: The defendant had access to a cellular telephone but elected not to use it to call the police. He had a loaded handgun in his vehicle. He knew of Michael's propensity for violence. He did not leave the premises when Brenda asked him to; rather, he confronted Michael and called him a "wifebeater." The defendant exhibited a great disregard for Brenda and the Croslin children, who were four feet behind Michael at the time of the shooting. From this evidence, the State concludes that the defendant's reputation as a peaceful person is inapplicable when the defendant has access to a weapon. The State reasons that the defendant will be reckless when he thinks he can get away with it and that a departure sentence does not deter such conduct.

The defendant correctly points out that in reviewing the decision of the trial court, this court must accept as true the evidence and all inferences which may be drawn from the evidence which support the findings of the trial court. *Ratley*, 253 Kan. at 398; *Taylor*

*v. State*, 252 Kan. 98, Syl. ¶ 3, 843 P.2d 682 (1992). It is not this court's function to reweigh the evidence.

The defendant reasons that the court's finding on the lack of threat to society was supported by the following evidence: The defendant was released on bail; between the date of the offense and sentencing the State did not express concern about any threat to public safety; the defendant had no prior criminal history; the defendant had no history of violence; and Michael prompted the incident by calling the defendant. The defendant also stresses that the State was specifically given the opportunity to show the trial court that the defendant posed a threat to society, but the State was unable to do so.

A primary reason given by the trial court for imposing a downward departure sentence was the defendant's lack of threat to public safety. The court indicated that it would sentence the defendant to the state penal system if it felt that the defendant was a threat to anybody.

The record contains evidence that the defendant is mild-mannered, peaceful, and non-violent. The trial court's finding that the defendant did not pose a threat to society was supported by substantial evidence in the record. How much weight that factor gets will be discussed later in this opinion.

### Concern for Brenda

The State also asserts the trial court's finding that the defendant went to Michael's house out of concern for the welfare of Brenda was not supported by substantial evidence. The State contends that the defendant went to Michael's to provoke a confrontation.

The State points out that the defendant had an alternate course of conduct if he was concerned for Brenda's welfare: He could have called the police as he had done on a previous occasion when confronted by Michael. The State also reasons that the defendant's behavior after arriving at Michael's exhibited no concern for Brenda: Brenda repeatedly asked the defendant to leave, but rather than question Brenda about her welfare he taunted Michael and challenged him to come out of the house. Moreover, the State argues, the defendant's conduct in shooting Michael without re-

gard for where Brenda and the Croslin children were indicates no concern for Brenda's welfare.

The defendant's response is that he knew Brenda had been beaten by Michael in the past and within the weeks preceding the incident. He contends that Michael initiated the incident by calling the defendant. In his confession, the defendant stated, "I thought he'd finally gone off the deep end. I thought—I thought she was going to be dead." The defendant told the trial court at sentencing: "I went there . . . that night with intent to help Brenda and that was it." The defendant also stresses that he remained near his truck after he arrived at Michael's and he retrieved his gun only after Michael came toward him with what the defendant believed was a gun.

There is substantial evidence in the record from which the trial court could conclude that the defendant went to Michael's house out of concern for Brenda. The fact that the defendant had an alternative course of action—calling the police—does not negate the evidence that he went to Michael's out of concern for Brenda's welfare, and neither do his actions in shooting Michael despite Brenda's proximity to Michael. As the defendant points out, he was aware of the violent relationship between Brenda and Michael. The trial court could conclude based on the evidence at trial and the defendant's statement at sentencing that the defendant's motivation for going to Michael's house was concern for Brenda.

## DEPARTURE SENTENCE

K.S.A. 1994 Supp. 21-4716 governs departure sentences. In pertinent part, that statute provides:

"(a) The sentencing judge shall impose the presumptive sentence provided by the sentencing guidelines . . . unless the judge finds substantial and compelling reasons to impose a departure. If the sentencing judge departs from the presumptive sentence, the judge shall state on the record at the time of sentencing the substantial and compelling reasons for the departure.

"(b) (1) Subject to the provisions of subsection (b)(3), the following nonexclusive list of mitigating factors may be considered in determining whether substantial and compelling reasons for a departure exist:

(A) The victim was an aggressor or participant in the criminal conduct associated with the crime of conviction.

(B) The offender played a minor or passive role in the crime or participated under circumstances of duress or compulsion. This factor is not sufficient as a complete defense.

(C) The offender, because of physical or mental impairment, lacked substantial capacity for judgment when the offense was committed. The voluntary use of intoxicants, drugs or alcohol does not fall within the purview of this factor.

(D) The defendant, or the defendant's children, suffered a continuing pattern of physical or sexual abuse by the victim of the offense and the offense is a response to that abuse.

(E) The degree of harm or loss attributed to the current crime of conviction was significantly less than typical for such an offense.

(2) [Section on nonexclusive list of aggravating factors is omitted.]

(3) If a factual aspect of a crime is a statutory element of the crime or is used to subclassify the crime on the crime severity scale, that aspect of the current crime of conviction may be used as an aggravating or mitigating factor only if the criminal conduct constituting that aspect of the current crime of conviction is significantly different from the usual criminal conduct captured by the aspect of the crime.

"(c) In determining aggravating or mitigating circumstances, the court shall consider:

(1) Any evidence received during the proceeding;

(2) the presentence report;

(3) written briefs and oral arguments of either the state or counsel for the defendant; and

(4) any other evidence relevant to such aggravating or mitigating circumstances that the court finds trustworthy and reliable." K.S.A. 1994 Supp. 21-4716.

K.S.A. 1994 Supp. 21-4728 states, "The sentencing court should consider in all cases a range of alternatives with gradations of supervisory, supportive and custodial facilities at its disposal so as to permit a sentence appropriate for each individual case, consistent with these guidelines and the permitted dispositional and durational departures contained in this act." K.S.A. 1994 Supp. 21-4719 sets some limits on departure sentences:

"(a) When a departure sentence is appropriate, the sentencing judge may depart from the sentencing guidelines as provided in this section.

"(b) When a sentencing judge departs in setting the duration of a presumptive term of imprisonment:

(1) The judge shall consider and apply the enacted purposes and principles of sentencing guidelines to impose a sentence which is proportionate to the severity of the crime of conviction and the offender's criminal history; and

(2) the presumptive term of imprisonment set in such departure shall not total more than double the maximum duration of the presumptive imprisonment term.

"(c) When a sentencing judge imposes a prison term as a dispositional departure:

(1) The judge shall consider and apply the enacted purposes and principles of sentencing guidelines to impose a sentence which is proportionate to the severity of the crime of conviction; and

(2) the term of imprisonment shall not exceed the maximum duration of the presumptive imprisonment term listed within the sentencing grid. Any sentence inconsistent with the provisions of this section shall constitute an additional departure and shall require substantial and compelling reasons independent of the reasons given for the dispositional departure.

"(d) If the sentencing judge imposes a non-prison sentence as a dispositional departure from the guidelines, the recommended duration shall be as provided in subsection (c) of K.S.A. 21-4611 and amendments thereto."

The recommended duration of probation for a severity level 3 felony offense is 36 months, and the total period of probation shall not exceed 60 months or the maximum period of the prison sentence which could be imposed, whichever is longer. K.S.A. 1994 Supp. 21-4611.

## Substantial and Compelling Reasons

Whether the trial court's findings constitute substantial and compelling reasons for departure is question of law. The question in this analysis is twofold. First, is a particular reason given by the sentencing court a valid departure factor? Second, are the reasons, as a whole, substantial and compelling reasons for departure in a given case? Reasons which may in one case justify departure may not in all cases justify a departure. Rather, the inquiry must evaluate the crime and the departure factors as a whole to determine whether departure in a particular case is justified. It is a question of what weight to give each reason stated and what weight to give the reasons as a whole in light of the offense of conviction and the defendant's criminal history. The inquiry also considers the purposes and principles of the KSGA.

The sentencing court here gave four reasons for imposing a dispositional departure and sentencing the defendant to a nonprison sentence:

1. The defendant was being advanced upon by a man with a knife, though he made the wrong decision in handling the situation.
2. The objective evidence does not indicate an execution or cold-blooded killing of Michael Croslin.
3. The defendant does not pose a threat to the safety of society.
4. The defendant was motivated by concern for Brenda Croslin.

## 1. Armed Aggressor

The State reasons that the defendant's use of bad judgment when being approached by an armed aggressor cannot be considered as a substantial and compelling reason for departure because it is part and parcel of the defendant's voluntary manslaughter conviction. The State directs this court's attention to the following statutes:

"If a factual aspect of a crime is a statutory element of the crime or is used to subclassify the crime on the crime severity scale, that aspect of the current crime of conviction may be used as an aggravating or mitigating factor only if the criminal conduct constituting that aspect of the current crime of conviction is significantly different from the usual criminal conduct captured by the aspect of the crime." K.S.A. 1994 Supp. 21-4716(b)(3).

"Voluntary manslaughter is the intentional killing of a human being committed:
(a) Upon a sudden quarrel or in the heat of passion; or
(b) upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21-3211." K.S.A. 1994 Supp. 21-3403.

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force." K.S.A. 21-3211.

The defendant points out that the fact the victim was an aggressor is a statutory mitigating departure factor listed in K.S.A. 1994 Supp. 21-4716(b)(1)(A). He reasons that the evidence here clearly showed that Michael Croslin was an aggressor.

According to the State's analysis, the sentencing court's finding that the defendant used bad judgment when confronted with an armed person is a fact inherent in, and not significantly different than, the conduct usually found in a voluntary manslaughter conviction. The State argues that the fact the victim was an armed

aggressor is captured by the element of voluntary manslaughter dealing with the defendant's unreasonable belief that deadly force was justified; therefore, that factor cannot be used as a departure reason.

As the defendant points out, however, there are alternative means by which voluntary manslaughter may be committed: upon a sudden quarrel or in the heat of passion, or by an unreasonable but honest belief that deadly force was justified. The jury verdict does not indicate by which means it found the defendant guilty. Indeed, the State argued to the trial court during the defendant's post-trial motion for acquittal that there was no indication by which alternative means the jury convicted the defendant. Moreover, during the sentencing hearing both parties so argued.

The mitigating circumstance found by the sentencing court and the element of the offense of conviction are somewhat different.

In *State v. Alexander*, 125 Wash. 2d 717, 888 P.2d 1169 (1995), the defendant sold an undercover police officer $20 worth of cocaine (an estimated .03 gram, an amount too small to be measured). The trial court gave a downward dispositional departure. In Washington state, by statute, a substantial and compelling reason for an upward departure is that the crime involved quantities of drugs substantially greater than for personal use or the defendant exhibited a high degree of sophistication. The trial judge held that by logical corollary a very small amount of drugs or a low degree of sophistication is justification for a downward dispositional departure.

The Washington Supreme Court held that in determining whether the legislature necessarily considered the factor "in establishing the standard sentence range depends both on whether the factor is an element of the crime of which the defendant has been convicted, and on whether the factor is considered in the computation of a defendant's standard sentence range" under the sentencing guidelines. 125 Wash. 2d at 726. In essence, the Washington court held the extraordinary small amount justified a downward departure while the level of sophistication did not.

Obviously, the *Alexander* case can be distinguished from the case before this court. It does, however, illustrate that where there is

reasonable doubt as to whether the legislature necessarily considered a factor in establishing the standard sentence range, the trial court has discretion to depart.

K.S.A. 1994 Supp. 21-4716(b)(3) does not prohibit the finding that the victim was an armed aggressor as a mitigating factor in this case because the State has not established on what basis the defendant was convicted of voluntary manslaughter; thus, the fact the deceased was armed with a deadly weapon and may have been the aggressor involves exceptional circumstances that can justify a downward departure.

### 2. Not a Cold-Blooded Killing

Another reason for departure cited by the sentencing court was that the objective evidence did not suggest a cold-blooded, execution-style killing; rather, the incident was one of general confusion. As with the "armed aggressor" departure factor, the State argues that this departure factor violates K.S.A. 1994 Supp. 21-4716(b)(3). The State reasons that this finding is merely a finding that the killing was not premeditated, a fact already determined by the jury's verdict of guilty of voluntary manslaughter and a fact already considered by the Legislature in classifying the offense of voluntary manslaughter.

The defendant cites *State v. Freitag*, 74 Wash. App. 133, 873 P.2d 548 (1994). There, the defendant was convicted of vehicular assault. A downward departure sentence was imposed, largely because of the defendant's crime-free history, even though her criminal history rating ("0") was already taken into account in establishing the presumptive sentence. Citing *State v. Nelson*, 108 Wash. 2d 491, 740 P.2d 835 (1987), the Washington Court of Appeals concluded that not all "0" criminal history scores are created equal. The court distinguished between a lack of "counted" criminal history and a lack of any criminal history whatsoever. The court concluded that the defendant's lack of counted criminal offenses could not be used as a departure factor. However, because a criminal history rating of "0" did not reflect her *complete* lack of any police contacts whatsoever, the defendant's complete lack of criminal contacts could be considered. 74 Wash. App. at 141, 145.

Our Court of Appeals has adopted a similar rule in relation to the age of a defendant's prior criminal history. In *State v. Richardson*, 20 Kan. App. 2d at 943, the Court of Appeals held that the trial court could properly consider the time elapsed since the defendant's last felony offenses as a departure factor because that factor was not taken into account in calculating the defendant's criminal history rating.

The element of premeditation will be lacking in all voluntary manslaughter offenses. By finding the defendant guilty of voluntary manslaughter, thereby acquitting the defendant of first-degree murder, the jury found that the defendant's crime was not premeditated, *i.e.,* not a cold-blooded or execution-style killing. That fact is already taken into consideration in establishing the presumptive sentence for the defendant's crime. Therefore, it may not be used again as justification for a dispositional departure.

### 3. No Threat to Society

We believe the trial court's finding that defendant would be no threat to society is wider than the State paints it. In *State v. Rogers*, 112 Wash. 2d 180, 183, 770 P.2d 180 (1989), the State of Washington held that the fact a defendant has never been convicted of a crime may not be used as a basis to depart. However, the Washington appellate courts have not always followed that general rule, instead making exceptions where the lack of a criminal history can be interpreted to support a lack of any predisposition to commit not only a similar crime but any other crime (*State v. Freitag*, 74 Wash. App. 133) and where the lack of criminal history is combined with a failed common-law or statutory defense. Boerner, Sentencing in Washington § 9.12(c), 9-23, 9-24; § 9.12(c)(4), 9-29, 9-30 (1985); *State v. Nelson*, 108 Wash. 2d 491. Here, we have a failed self-defense theory by a person with no prior criminal history.

In *State v. Gideon*, 257 Kan. at 625, we held the trial court did not err in using prior convictions of the same statutory offense as substantial and compelling reasons to impose an upward departure from the sentencing guidelines.

We believe the legislature did not intend to prohibit a lack of criminal history as a downward dispositional departure factor in all

cases. While generally criminal history is an improper departure factor because criminal history has already been used to set the presumptive sentence, we believe the legislature intended in the interest of justice that a trial court have discretion to impose a downward dispositional departure where a defendant has no prior criminal history and has a failed common-law or statutory defense that is not meritless. We also construe the trial court's finding that the defendant poses no threat to society to be a finding that the defendant has no predisposition to commit a similar crime or any other crime. These are appropriate mitigating factors for a downward dispositional departure.

### 4. Concern for Brenda

The State also complains of the sentencing court's reliance on the defendant's motivation for going to Michael's house as a departure factor. The sentencing court found that the defendant went to the victim's house out of concern for Brenda, a finding that is supported by substantial evidence in the record. The State argues that the defendant's motivation is not a fact which distinguishes this case from all other voluntary manslaughter cases.

The State is incorrect in arguing that a defendant's motivation or alternate course of conduct is inherent in every voluntary manslaughter case. The defendant's motivation has not been considered by the legislature in classifying the defendant's crime and in establishing the presumptive sentence. However, the defendant's motivation in being at the location of the crime is not, by itself, a substantial and compelling reason justifying departure in this case. Whether the defendant was prompted to go to Michael's house out of concern for Brenda or for some other reason, such as that he went to Michael's house with Brenda to pick up her children, that fact does not make this voluntary manslaughter offense so different from other voluntary manslaughter offenses as to be a substantial and compelling reason for departure. The trial court's finding that the defendant's motivation for being at the location of the offense was concern for Brenda is equivalent to a finding that the defendant did not go to that location to provoke a conflict with the victim. While motivation for being at the location of an offense may in

some instances distinguish one defendant's offense from other similar crimes, it is not, by itself, a substantial and compelling distinction here.

### Was Departure Justified?

The final analysis is not whether any departure factor, in isolation, *can* be a substantial and compelling reason for departure but whether, *as a whole*, the factors are substantial and compelling reasons for imposing a departure sentence in this case in light of the offense of conviction, the defendant's criminal history, and the purposes of the sentencing guidelines.

The Kansas Legislature did not include in the statutes the purposes and objectives of the guidelines. According to the legislative history, the Kansas Sentencing Guidelines Act (KSGA), K.S.A. 1994 Supp. 21-4701 *et seq.*, is based on the following principles:

1. Prison space should be reserved for serious/violent offenders who present a threat to society.

2. The degree of sanctions imposed should be based on the harm inflicted.

3. Sanctions should be uniform and not related to socioeconomic factors, race, or geographic location.

4. Penalties should be clear so everyone can understand exactly what has occurred once sentence is imposed.

5. The State has an obligation to rehabilitate those incarcerated, but persons should not be sent to prison solely to gain education or job skills, as these programs should be available in the community.

6. The system must be rational to allow policy makers to allocate resources. Coates, Summary of the Recommendations of the Sentencing Commission, p. 6 (Report to Senate Committee on Judiciary, January 14, 1992). See also Kansas Sentencing Guidelines Implementation Manual, p. i-1-2 (1992).

Additionally, this court has recognized that the purpose of the retroactivity provision of the KSGA is to reduce prison overcrowding while protecting public safety. The guidelines were intended to standardize sentences so that similarly situated offenders would be

treated the same, limiting the effects of racial or geographic bias. *State v. Gonzales,* 255 Kan. 243, 249, 874 P.2d 612 (1994).

The sentencing court here discussed on the record its rationale for treating the defendant locally, stating:

"The issue is is Mr. Grady a threat to society and what is [the] appropriate way for that punishment to be done? The issue is becoming increasingly, if we don't know it already then we better start to take notice of it now, that we are coming to a place where local corrections and state corrections are going to be more sharply defined.

"The State government is reducing its state corrections and looking more to the local community to undertake corrections. The question is are we in a posture where local corrections are sufficient punishment for what Mr. Grady has done or is it a state matter? I'm going to take the position that if he were a threat to society, a threat to anybody around, if I thought for one instant anything like this might occur again I would send him to the state penal system.

"I believe that this is a matter which since there is no threat to society that his 49 months of punishment must somehow be done within the tools available to us locally."

The court imposed the most severe nonprison sentence it thought possible.

The court's rationale is in keeping with the principle behind the KSGA for reserving incarceration for serious or violent offenders who present a threat to public safety. The departure findings made by the trial court are supported by substantial evidence in the record, and as a whole the findings constitute substantial and compelling reason for a downward dispositional departure.

The trial court is affirmed.