Nos. 77,657
77,805

STATE OF KANSAS, *Appellee,* v. GEORGE BAILEY, *Appellant.*

(952 P.2d 1289)

Opinion filed January 23, 1998.

*Michael J. Helvey,* assistant appellate defender, argued the cause, and *Steven R. Zinn,* deputy appellate defender, was with him on the brief for appellant.

*Debra S. Peterson,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Carla J. Stovall,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: George Bailey was convicted by a jury of the intentional second-degree murder of Thomas Dunigan. The guidelines sentence range was 92 to 103 months; Bailey was sentenced to a term of imprisonment of 154 months. He appeals the conviction and sentence. The case was transferred from the Court of Appeals on this court's motion, pursuant to K.S.A. 20-3018(c).

There is no dispute that George Bailey shot Thomas Dunigan in the head with a .22-caliber pistol in the early morning hours of October 20, 1995. Dunigan died 10 days later as a result of the gunshot wound. Bailey was charged with premeditated first-degree murder. He was convicted by a jury of intentional second-degree murder.

Bailey lived alone in a duplex apartment. Dunigan lived with Helen Reed in the apartment on the other side of the duplex. The night of the shooting, Dunigan's sister, Cordia Willrich, also was staying at his apartment. She testified that Dunigan and Bailey sold cocaine out of Bailey's apartment. Jimmy Thomas provided protection for them, and James McKinney supplied the drugs.

The afternoon of October 19, Willrich and James Washington were in front of Dunigan's apartment when Bailey came walking down the street. Bailey was acting strangely and he was talking out loud. He said, "I'm going to kill that nigger," and, "I'm going to kill that mother fucker." Washington asked Bailey who he was talking about, and Bailey said, "That damn Thomas." That same day, Willrich told her brother what Bailey had said. Dunigan assured her that Bailey was his friend and that Bailey was just talking and was not going to do anything.

At approximately 3:00 the next morning, Willrich was awakened when a woman named Doris knocked on the door of Dunigan's apartment to tell them that Bailey had shot Dunigan. Willrich went

to the hospital where her brother had been taken. Dunigan never regained consciousness. He was disconnected from life support systems after 10 days.

James Washington testified that he heard Bailey and Dunigan shouting at each other the evening of October 18. Then Bailey threatened to kill Dunigan. Bailey was violent when he was drinking. He carried "an old [type gun] . . . like [a] .22 or something" in his pocket all the time. When Bailey was lying on the couch, he would lay the gun right by the sofa where he could reach it.

Sherry Baker went to Bailey's apartment at about 4 a.m. on October 20. She went with someone identified as Louis Franklin, who did not want to go to Bailey's by himself. Dunigan, Bailey, and Thomas were in the living room. Bailey was on the couch, and Dunigan was sitting in a chair. Shortly after Baker and Franklin arrived, Bailey said, "I'm tired of you all stealing from me." Baker thought Bailey was talking to Dunigan and Thomas. Looking at Dunigan and Thomas, Bailey continued, "I'll kill you MF for always stealing my stuff." Bailey reached under the couch and got a handgun. Thomas ran into the kitchen, but the others sat still. Bailey shot Dunigan and then said, "[G]et this MF out of here before I shoot him again." While Bailey remained seated, Thomas ran out the door, and Franklin picked Dunigan up under the arms and dragged him outside. After Bailey went to the bathroom, he walked Baker to the corner. According to Baker, he had the gun in his hand as they walked. At the corner, Baker went on toward her house, and Bailey returned to his apartment.

Bailey testified that Dunigan had moved next door to him around the first of the year in 1995. In approximately June 1995, Bailey complained to Dunigan about Dunigan's dealing drugs in front of Bailey's door. Dunigan responded that he and his partners needed Bailey's apartment. Thomas virtually moved in with Bailey, and Dunigan was in and out. Bailey said that they were selling drugs in his apartment 24 hours a day. Bailey testified that he went along with what they wanted because they threatened him and his parents. Bailey claimed that Dunigan and Thomas forced him to miss work in order to get him fired so that he would have to stay at home. The night he shot Dunigan, he took a bus to Oklahoma

City to stay with his sister. He described it as his chance to get away.

With regard to his shooting Dunigan, Bailey testified that he had been drinking most of the day. He fell asleep in the afternoon or early evening. He was asleep on the couch when Sherry Baker and her companion came in. They were arguing about cigarettes. According to Bailey, "[Dunigan] moved from the divan over in the chair. By doing so he left the gun laying down on the floor, side of the divan." Thomas "was in the kitchen cooking up dope." As the argument about the cigarettes began again, according to Bailey, Thomas shouted from the kitchen that they could "trash" Bailey. Bailey's account of the shooting continues: "So at that time I reached down. I saw the gun—butt of the gun down by the divan. I reached down and grabbed it. I shot really to frighten everybody so they can run. I would get a chance to get out of there. In the process I guess I hit him." All Bailey could remember saying was, "[Y]ou all get the hell out of here."

Bailey first argues that the district court should have instructed the jury on the lesser included offenses of reckless second-degree murder and reckless involuntary manslaughter. The trial court instructed the jury on premeditated first-degree murder, intentional second-degree murder, voluntary manslaughter, and involuntary manslaughter. Defense counsel also requested instructions on reckless second-degree murder and a somewhat different instruction on involuntary manslaughter. On appeal, he complains of the trial court's refusal to give the requested instructions.

"In a criminal action, a trial court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When considering the refusal of a trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction." *State v. Bornholdt*, 261 Kan. 644, Syl. 16, 932 P.2d 964 (1997).

The jury was instructed on second-degree murder and involuntary manslaughter as follows:

"To establish this charge [of second-degree murder], each of the following claims must be proved:
1. That the defendant intentionally killed Thomas Dunigan; and

2. That this act occurred on or about the 20th day of October, 1995, in Sedgwick County, Kansas."

"To establish this charge [of involuntary manslaughter], each of the following claims must be proved:
1. That the defendant unintentionally killed Thomas Dunigan;
2. That it was done during the commission of the lawful act of self defense or defense of a dwelling in an unlawful manner by the use of excessive force; and
3. That this act occurred on or about the 20th day of October, 1995, in Sedgwick County, Kansas."

Defendant requested an instruction pursuant to K.S.A. 21-3402(b), which states: "Murder in the second degree is the killing of a human being committed . . . unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." The involuntary manslaughter instruction requested by defense counsel would have stated the following:

"To establish this charge, each of the following claims must be proved:
1. That the defendant unintentionally killed Thomas Dunigan;
2. That it was done:
    . . . recklessly;
3. That this act occurred on or about the 20th day of October, 1995, in Sedgwick County, Kansas." See PIK Crim. 3d 56.06.

The trial court gave the following reason for not instructing the jury on reckless second-degree murder:

"Primarily, it is this Court's belief that the evidence as it has unfolded insofar as the defendant's theory of the case would be that he acted in self-defense and in defense of his dwelling. Any individual acting in self-defense cannot act recklessly. That, of course, is set forth in *State versus Warren*, also numerous other cases within this jurisdiction. The jury perhaps could believe that the defendant was not acting in self-defense.

"However, from the testimony of the defendant, I believe it quite clear he intentionally fired the gun. His actions were not done in a reckless or wanton manner. Therefore, I am not going to give . . . second-degree reckless."

Defense counsel responded, "[I]n the event the jury could disregard Mr. Bailey's testimony entirely, that they base it on the testimony they heard from various State's witnesses. Considering the fact that the alcohol use, they could find it was a reckless act." The jury was instructed that voluntary intoxication could be a defense

insofar as it impaired the defendant's mental ability to form pre-meditation or intent to kill. It also was instructed on self-defense and defense of a dwelling.

The trial court reiterated its stated reason for not instructing on reckless second-degree murder with respect to not instructing the jury on reckless involuntary manslaughter. Defense counsel asked that the instruction be given because Bailey's testimony was that he was simply firing in Dunigan's direction. When the trial court noted that the instruction "would not . . . jive with your self-defense theory," defense counsel responded that the jury could disregard Bailey's testimony. On appeal, Bailey adds the argument that it is immaterial whether the shooting was intentional because the controlling factor is whether the killing was intentional. His point is that he had not intended to kill Dunigan, even though he pointed the gun at him and pulled the trigger. In other words, he contends that an intentional act done without regard to the consequences is reckless. Neither the case law nor the legislative history supports this argument.

In *State v. Pierce*, 260 Kan. 859, 927 P.2d 929 (1996), the court considered a request for a reckless second-degree murder instruction in circumstances comparable to those in the present case. The evidence in *Pierce* showed that defendant shot and killed one young boy out of a group of three. In defendant's account, the boys tried to rob him and the one he shot had pulled a knife on him. In the court's words, "the defendant's statement clearly and consistently seeks to establish that he shot in self-defense." 260 Kan. at 866. The court concluded:

"There is no evidence of recklessness. The defendant's actions were intentional, according to the only evidence admitted, including his own statements. At best the evidence on behalf of the defendant suggested that he did not intend to kill the victim but only defended himself by shooting the victim in the leg. The instructions given by the court, including the involuntary manslaughter instruction, are consistent with the defendant's theory. Under these circumstances, since all evidence supports *an intentional shooting*, the evidence, when viewed in the light most favorable to the defendant's theory of reckless second-degree murder, would not have justified a jury verdict on this offense. Accordingly, the trial court was under no duty to instruct on this lesser included offense." (Emphasis added.) 260 Kan. at 867.

We find *Pierce* controlling in the present case. Bailey cites *Pierce* but ignores its clear message—a defendant's actions in pointing a gun at someone and pulling the trigger are intentional rather than reckless even if the defendant did not intend to kill the victim. Bailey also relies on a discussion of legislative history in *State v. Mitchell*, 23 Kan. App. 2d 413, 420, 932 P.2d 1012 (1997):

"The fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *City of Wichita v. 200 South Broadway*, 253 Kan. 434, 436, 855 P.2d 956 (1993). The legislature has given us a clue as to its intent in creating K.S.A. 21-3402(b). The Supplemental Note on S.B. 358 explained:

'The crime of second degree murder . . . is expanded to include unintentional but reckless killings under circumstances manifesting an extreme indifference to the value of human life—the so-called "depraved heart" murder which would include firing an automatic weapon into a crowded restaurant or a crowd of people on a street corner. The majority of states and the Model Penal Code recognize this category of murder. Without such a category of murder, extremely reckless killings likely can only be charged as involuntary manslaughter.' "

Rather than supporting Bailey's argument, the examples of conduct that could be charged under the reckless second-degree murder statute are readily distinguishable. They illustrate that the defendant's singling out an individual seated only a few feet away, pointing a gun directly at his head, and then firing was not conduct contemplated by the legislature. Just as the evidence does not show reckless conduct for the purpose of instructing on reckless second-degree murder, it does not show reckless conduct for the purpose of instructing on reckless involuntary manslaughter. Even viewed in the light most favorable to defendant, the evidence does not support defendant's theories of the lesser included offenses. Thus, the district court acted properly in refusing to give the requested instructions.

Bailey next argues that his federal constitutional right to confront the witnesses against him was violated by the admission of police testimony about the out-of-court statements of two unavailable witnesses. Louis Franklin and Jimmy Thomas gave tape-recorded statements to police during the investigation of this case. At the time of trial, they were subpoenaed to testify and were named in material witness warrants. Neither could be found. The State

sought leave to use the witnesses' statements. Defense counsel objected at all appropriate times.

K.S.A. 60-460(d)(3) provides:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

. . . .

(d) . . . . A statement which the judge finds was made . . . (3) if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."

The district court found that the witnesses were unavailable. On appeal, Bailey does not question this finding.

The district court further found that the other requirements of 60-460(d)(3) were satisfied—the matters described were recently perceived by the declarants and while the memory was fresh, and the statements were given before there were charges filed and in circumstances indicative of good faith. The district court, therefore, preliminarily ruled that the statements would be admissible. With regard to the defendant's Confrontation Clause rights, the district court required a further showing of reliability of the statements. For this purpose, the prosecutor submitted to the court the reports of detectives Relph and Herbel, which contained the content of their interviews with the missing witnesses. Asserting that there were variances with regard to Louis Franklin's statements in the detectives' reports and Officer Kimball's report, defense counsel asked the trial court to compare them.

In *State v. Bratt*, 250 Kan. 264, 824 P.2d 983 (1992), this court considered the effect of the Confrontation Clause on the admissibility of hearsay statements in a criminal trial. Taking into account the United States Supreme Court's decisions in *Idaho v. Wright*, 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139 (1990), and *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), this court stated and applied the following principles:

"The Confrontation Clause operates in two ways when determining the admissibility of hearsay statements. First, the Sixth Amendment establishes a rule of

necessity. In the usual case, the prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant. Second, once a witness is shown to be unavailable, the witness' statement is admissible only if it bears adequate indicia of reliability. *Reliability can be inferred where the evidence falls within a firmly rooted hearsay exception.* If the evidence does not fall within a firmly rooted hearsay exception, the evidence must be excluded absent a showing of particularized guarantees of trustworthiness." (Emphasis added.) 250 Kan. 264, Syl. ¶ 1.

"Particularized guarantees of trustworthiness required for admission of a hearsay statement under the Confrontation Clause must be shown from the totality of the circumstances that surround the making of the statement and that render the declarant particularly worthy of belief. Evidence possessing particularized guarantees of trustworthiness must be at least as reliable as evidence admitted under a firmly rooted hearsay exception and must be so trustworthy that adversarial testing would add little to its reliability." 250 Kan. 264, Syl. 2.

In *Ohio v. Roberts*, the United States Supreme Court explained that allowing reliability to be inferred, without more, from the evidence's falling within a firmly established hearsay exception was a reflection of "the truism that 'hearsay rules and the Confrontation Clause are generally designed to protect similar values,' . . . and 'stem from the same roots.' " 448 U.S. at 66.

Without actually discussing it, Bailey assumes in his brief that the statements of Franklin and Thomas do not fall within a firmly rooted hearsay exception. In ruling that the statements were admissible, the district court came to the contrary conclusion. In addition, the district court found particularized guarantees of trustworthiness. The guarantees of trustworthiness found by the trial court (1) corresponded to the statements and the physical evidence in the case and (2) corresponded to the statements and the sworn testimony of Baker, the other eyewitness to the shooting. The location of the .22 cartridge shell was given as an example of correspondence between the statements and physical evidence. The trial court added that certain particularized guarantees of trustworthiness were built into a 60-460(d)(3) exception. This last seems to be a reiteration of and rationale for the rule that reliability can be inferred where the evidence falls within a firmly rooted hearsay exception. It also may be seen as directed at the requirement that particularized guarantees of trustworthiness must be shown from

the totality of the circumstances. That is, the same inquiry is necessary in order to satisfy the statutory requirements for admissibility.

In its brief, the State notes: "The defendant makes no claim that K.S.A. 60-460(d)(3) is not a firmly rooted hearsay exception." The State, however, does not follow up on its observation.

In *Idaho v. Wright*, hearsay statements made by a 3-year-old child declarant to an examining pediatrician were admitted at trial under the State's "residual hearsay exception." 497 U.S. at 811. It applied to statements "not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness." 497 U.S. at 812. In its opinion, the Supreme Court discussed what constitutes a firmly rooted hearsay exception:

"We note at the outset that Idaho's residual hearsay exception, Idaho Rule Evid. 803(24), under which the challenged statements were admitted, App. 113-115, is not a firmly rooted hearsay exception for Confrontation Clause purposes. Admission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements. See *Mattox*, 156 U.S., at 243; *Roberts*, 448 U.S., at 66; *Bourjaily*, 483 U.S., at 183; see also *Lee, supra*, at 552 (Blackmun, J., dissenting) ('[S]tatements squarely within established hearsay exceptions possess "the imprimatur of judicial and legislative experience" . . . and that fact must weight heavily in our assessment of their reliability for constitutional purposes') (citation omitted). The residual hearsay exception, by contrast, accommodates ad hoc instances in which statements not otherwise falling within a recognized hearsay exception might nevertheless be sufficiently reliable to be admissible at trial. See, *e.g.*, Senate Judiciary Committee's Note on Fed. Rule Evid. 803(24), 28 U.S.C. App., pp. 786-787; E. Cleary, McCormick on Evidence § 324.1, pp. 907-909 (3d ed. 1984). Hearsay statements admitted under the residual exception, almost by definition, therefore do not share the same tradition of reliability that supports the admissibility of statements under a firmly rooted hearsay exception. Moreover, were we to agree that the admission of hearsay statements under the residual exception automatically passed Confrontation Clause scrutiny, virtually every codified hearsay exception would assume constitutional stature, a step this Court has repeatedly declined to take. See *Green*, 399 U.S., at 155-156; *Evans*, 400 U.S., at 86-87 (plurality opinion); *Inadi*, 475 U.S., at 393, n.5; see also *Evans, supra*, at 94-95 (Harlan, J., concurring in result)." 497 U.S. at 817-18.

This court, in *State v. Bratt*, concluded that the hearsay statements of the 5-year-old victim were inadmissible under the Confrontation

Clause, and the convictions of his parents were reversed. 250 Kan. at 273. The hearsay exception which had been invoked in admitting the 5-year-old's statement was K.S.A. 1990 Supp. 60-460(dd), which governed an "apparently reliable" statement made by a child crime victim who was not available as a trial witness and which was not made under threat or promise.

In *Ohio v. Roberts*, the Court referred to "certain hearsay exceptions [that] rest upon such solid foundations that admission of virtually any evidence within them comports with the 'substance of the constitutional protection.' *Mattox v. United States*, 156 U.S. at 244." 448 U.S. at 66. Footnote 8 states:

"See, *e.g.*, *Pointer v. Texas*, 380 U.S., at 407 (dying declarations); *Mattox v. United States*, 156 U.S., at 243-244 (same); *Mancusi v. Stubbs*, 408 U.S. 204, 213-216 (1972) (cross-examined prior-trial testimony); Comment, 30 La. L. Rev. 651, 668 (1970) ('Properly administered the business and public records exceptions would seem to be among the safest of the hearsay exceptions')." 448 U.S. at 66 n.8.

The evidence at issue in *Roberts* was preliminary hearing testimony of a witness who was not present for trial.

The hearsay exception at issue in the present case would seem to lie somewhere between the hearsay exceptions carved out for child victims and the preliminary hearing testimony in *Roberts*. It is richer in indicia of reliability than a small child's statement on a grown-up subject, but it lacks some indicia of reliability that one would associate with cross-examined testimony. It is included as part of the Kansas Rules of Evidence, which indicates the legislature's longstanding recognition of its trustworthiness. We question whether K.S.A. 60-460(d)(3) meets the above criterion of a "firmly rooted" hearsay exception for confrontation purposes. See Klemme and Prater, *Res Gestae Raises Its Ugly Head*, 65 J.K.B.A. 24, 32 (Oct. 1996). However, defendant does not take issue with the trial court's determination that 60-460(d)(3) is a firmly rooted hearsay exception but, instead, argues that based on the totality of the circumstances, the statements do not have a particularized guarantee of trustworthiness.

The district court took the additional step and concluded that there were particularized guarantees of trustworthiness—the state-

ments and the physical evidence corresponding to the statements and Baker's sworn testimony—as well as the indicia of reliability required by K.S.A. 60-460(d)(3). Bailey does not seem to contest the correspondences found by the district court. Bailey contends, however, that in looking at details of the shooting, the court was looking at an aspect of the case where corroboration would not tend to show reliability. He did not deny shooting Dunigan. Instead, he defended his action by testifying that "he was held hostage for the purpose of selling drugs from his house."

With respect to Franklin, Bailey asserts: "Cross-examination of Franklin . . . would likely have revealed the real reason for the early morning visit to the crack house, and impeached Baker's credibility." Bailey cross-examined Baker, however, and there really is no reason to believe that cross-examination of Baker's companion would have accomplished anything more along these lines for the defense. In response to defense counsel's questions, Baker said she had been to Bailey's apartment two or three times before October 20, that she was not aware that it was known as a drug house, that she never saw any drug activity there, that Bailey and a woman named Michelle had been the only ones there when she had gone before, and that on October 20 she did not observe anyone drinking or using drugs.

With respect to Thomas, Bailey asserts: "Cross-examination would have exposed the involvement of Thomas in the drug sales, and clearly exposed his motivation to blame Bailey for the killing." The latter part of the assertion is immaterial under Bailey's own argument—Bailey does not deny shooting the victim. Detective Relph testified that Thomas said he had been at Bailey's apartment approximately 5 or 6 hours before the shooting and that he and Bailey had been drinking and using drugs. As far as drug sales are concerned, defense counsel asked the detective what Thomas had said about selling drugs:

"Q. When you asked him about whether there was illegal activity as far as drugs sales—you asked him about drug sales whether they were involved in that?
"A. Yes, I did.
"Q. Did he answer you? What kind of answer did he give you?

"A. I think he didn't really know what the business—if there was a business. He said he indicated he didn't know. But I asked him if he thought the argument may have been over the money involved in that business. He indicated probably.

"Q. He didn't take any responsibility for participation in the business; is that right?

"A. No.

. . . .

"Q. You asked him whether George Bailey was a dope dealer?

"A. Yes, I did.

"Q. On Page 13, what was his answer on that?

"A. I don't know.

"Q. Did you ask him whether Mr. Dunigan was a drug dealer?

"A. No, I did not ask that.

"Q. Did you ask him how often he frequented the—Mr. Bailey's residence?

"A. I don't recall during the taped portion, but I do recall that he indicated he had been going there. He would say I've been going there for a whole while."

The trial court is given considerable discretion in admitting statements under the hearsay exception for unavailable witnesses. *State v. Stafford*, 255 Kan. 807, 810, 878 P.2d 820 (1994) (quoting *State v. Hobson*, 234 Kan. 133, 158, 671 P.2d 1365 [1983]). Noting this standard of review, Bailey focuses his argument on the constitutional aspect of admission of the evidence. Indeed, no reason has been shown for this court to conclude that the district court abused its discretion in admitting the statements of Franklin and Thomas under K.S.A. 60-460(d)(3). This court's confrontation analysis, in contrast, is undertaken without deference to the district court's interpretation of the law. It appears from this court's review of the record that the district court considered the totality of the circumstances surrounding the making of the statements when considering requirements of the hearsay statute and then transferred those considerations and properly applied them in the constitutional analysis. We conclude that the out-of-court statements of Franklin and Thomas possessed sufficient particularized guarantees of trustworthiness so that cross-examination would add little to their reliability. Thus, although this use of hearsay by the prosecutor presents a close question, it satisfies the requirements of reliability and trustworthiness under the approach used by the United States Supreme Court and followed by this court. Furthermore, contrary to Bailey's assertions, the evidence would seem

unlikely to detrimentally affect his defense theory. In other words, if there was error, it was harmless.

Bailey also asserts that it was error for the district court to impose an upward departure sentence. The presumptive sentencing range was 92 to 103 months. The sentence imposed was for a term of 154 months' imprisonment. The district court's reasons for upward departure, stated at the time of sentencing and in the journal entry of judgment, were that Bailey created a danger of harm or death to more than one person and that he committed the murder while engaged in the operation of a crack cocaine house, a danger to society as a whole.

By statute, this court's review of a departure sentence is limited to whether the sentencing court's findings of fact and reasons justifying a departure (1) are supported by evidence in the record and (2) constitute substantial and compelling reasons for departure. K.S.A. 21-4721(d).

"K.S.A. 21-4721(d)(1) requires an evidentiary test—are the facts stated by the sentencing court in justification of departure supported by the record? K.S.A. 21-4721(d)(2) requires a law test—are the reasons stated on the record for departure adequate to justify a sentence outside the presumptive sentence?" *State v. Davis*, 262 Kan. 711, 714, 941 P.2d 946 (1997).

The second question is "whether, *as a whole*, the factors are substantial and compelling reasons for imposing a departure sentence in light of the offense of conviction, the defendant's criminal history, and the purposes of the sentencing guidelines." *State v. Grady*, 258 Kan. 72, 89, 900 P.2d 227 (1995).

Bailey cites *State v. Favela*, 259 Kan. 215, 238, 911 P.2d 792 (1996), for the proposition that "[a]n upward departure based on nonstatutory aggravating factors is subject to greater scrutiny than a departure based on aggravating factors listed in the statute." This court quoted the following passage from the Court of Appeals' concurring and dissenting opinion in *Favela*:

" 'Cases in which the sentencing court does not rely upon any statutory aggravating or mitigating factors to depart should be viewed with a stricter scrutiny. However, when the sentencing court relies upon statutory aggravating or mitigating factors to depart, these reasons should be given great deference by a reviewing court.' 21 Kan. App. 2d at 215." 259 Kan. at 238.

Although it did not expressly adopt this rule, the court's quoting the passage from the concurring and dissenting opinion would indicate agreement with it. In the present case, neither of the reasons given by the district court for imposing a departure sentence is a statutory factor. See K.S.A. 21-4716(b)(2).

Bailey contends that the first reason given by the trial court, that defendant created a danger of harm or death to more than one person in committing the crime, is not supported in the record. To some extent, whether the other people present were in danger can be deduced from their perceptions of threat or danger. There does not seem to be support in the record for finding that Franklin or Baker was endangered. Baker was one of the people present when Bailey shot Dunigan. She testified that she was afraid when Bailey pulled the gun out from under the sofa, but there is nothing in her testimony from which one could conclude that she was afraid for her own safety after Bailey pointed the gun at Dunigan. The prosecutor asked what was going through her mind and whether she was afraid when she saw that Bailey had shot Dunigan. Baker testified that Bailey said to get Dunigan out of there before he shot him again, and she was thinking that somebody should get Dunigan out of the apartment. Franklin picked Dunigan up under the arms and dragged him out the door. According to Baker, Bailey remained seated while Dunigan was being removed. In response to the question, "Were you scared he might hurt you?," Baker said, "No." She also testified that the only other person Bailey pointed the gun at was Jimmy Thomas. Thomas' statement suggested that his immediate fear gave way, upon reflection, to the conviction that he was never really in danger. According to Baker, Thomas ran out the door after the shooting and then Franklin took Dunigan out the door. When it was just Baker and Bailey left in the apartment, Bailey went to the bathroom. Baker remained. It reasonably can be inferred from Baker's testimony that Bailey went to the bathroom without the gun. She said, "Yeah, he came out of the bathroom, got the gun. He walked me to the corner. I went on home, and then he turned around, went back to where he stayed. I didn't see him no more then." Bailey carried the gun as he walked Baker to the corner.

The portions of the record that lend any support for a finding that defendant endangered more than one person are Detective Relph's account of what Thomas said to him, Baker's testimony that Bailey pointed the gun at Jimmy Thomas, and defendant's own theory of defense. The State suggests that Thomas' statement to Relph established that Thomas believed himself to be in danger, but examination of Relph's testimony reveals very little support. It was not until Relph had told the jury what Thomas said to him and had been cross-examined that he mentioned any threat to Thomas. Defense counsel wrapped up cross-examination with the question, "Doesn't he indicate to you, he said, 'I'll kill you, too'? Isn't that what Mr. Thomas said about Mr. Bailey?" Relph answered, "Yes, he said, 'I'll kill you, too.'" On redirect examination, Relph gave the following response to the question asking whether defendant threatened Thomas: "I think I asked him that. He doesn't recall ever being—the gun being pointed at him." Baker, however, testified that Bailey pointed the gun at Thomas. If Bailey was striking back at the people who had taken over his apartment for their drug operation, Jimmy Thomas would have been a target just as Dunigan was. As can be seen from the trial court's second reason for imposing a departure sentence, however, the trial court did not credit Bailey's defense. The trial court, instead, believed that Bailey was a willing and active participant in the drug operation. It would seem incongruous to find support for the first finding of the trial court in the defense theory, a portion of the record intentionally disregarded by the trial court. In particular, it would be inappropriate where, as here, the other finding of the trial court is based on its rejection of the defense theory. The trial court found that Bailey was involved in the operation of a crack house rather than being forced by thugs to let them sell drugs out of his house.

The quantum of support in the record is greater for the second finding than for the first. Willrich testified that her brother, Dunigan, and Bailey sold cocaine out of Bailey's apartment. She said that Jimmy Thomas provided the protection for their drug operation. When she was asked to whom Bailey and Dunigan sold cocaine, Willrich stated, "Several people that knocks on his door. If you rode down the street, you would see what was going on. It was

no secret." She said that Bailey, Dunigan, and Thomas all worked for James McKinney, who supplied them with the drugs they sold out of Bailey's apartment. Willrich's testimony, combined with the evidence of Franklin and Baker going to defendant's apartment in the early morning hours confident that they would find the door open to them, would seem to satisfy the evidentiary requirement.

Even if it does satisfy the requirement, Bailey argues, the reason given by the trial court for departure is not adequate to justify a sentence outside the presumptive sentence. In the journal entry, the trial court made the following statement of the second reason for departure: "Crime committed during operation of illegal drug activity that affects the community." Bailey contends, however, that there is no evidence "that the shooting had anything to do with drug sales. The record shows the shooting was the result of an argument over cigarettes." The State does not rebut defendant's contention. The State simply reiterates that "the evidence indicated the offense was committed during the operation of a crack house." By the same logic, any crime that occurred within the four walls of Bailey's apartment would be "committed during the operation of a crack house" because the actual sale or use of drugs would not need to be occurring at the time in order for the prosecution to characterize the activities in that residence as "the operation of a crack house."

Bailey also argues that uncharged crimes should not be the basis for departure: "If the State chose not to prosecute on aggravated assault and sale of cocaine, it should not be allowed to bootstrap punishment for these offenses onto the sentence for the conviction at issue." The State argues that the departure was not due to Bailey's committing aggravated assault or selling cocaine. Instead, it was due to Bailey's creating a risk of danger to people other than the murder victim. It is generally accepted, however, that the reason we, as a society, prosecute and punish such conduct is because it creates a risk of danger to others.

In summary, Bailey's contention that the evidence of his endangering more than one person is too thin to support departure from the sentencing guidelines has merit. There is a more substantial evidentiary base for the trial court's second finding, the drug ac-

tivities, but not that Bailey committed the murder while engaged in those activities, and thus it would not be a substantial and compelling reason for imposing a departure sentence for Dunigan's murder. By all accounts, Dunigan was a major player in the drug operation. The State's evidence tended to establish that Bailey's violent behavior was connected to his consuming alcohol, not drugs. Bailey, too, testified, "[O]nly drug I use is good booze." The nonstatutory reasons given by the trial court do not hold up well under strict scrutiny. In addition to looking at the factors "as a whole," this court is to view them "in light of the offense of conviction, the defendant's criminal history, and the purposes of the sentencing guidelines." *Grady*, 258 Kan. at 89. Bailey was charged with premeditated first-degree murder and convicted by the jury of intentional second-degree murder. He was 58 years old at the time of sentencing and had no prior felony convictions. The various purposes of the sentencing guidelines, which have been stated by this court—reserving incarceration for serious or violent offenders who present a threat to public safety and standardizing sentences—would seem to have no obvious bearing on this question.

"The appellate court may reverse or affirm the sentence. If the appellate court concludes that the trial court's factual findings are not supported by evidence in the record or do not establish substantial and compelling reasons for a departure, it shall remand the case to the trial court for resentencing." K.S.A. 21-4721(f).

Thus, pursuant to the statute, the sentence should be vacated and the case remanded to the trial court for resentencing.

The conviction is affirmed, the sentence is vacated, and the case is remanded for resentencing.