IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 111,166

STATE OF KANSAS,
*Appellee*,

v.

ANTONIO M. BROWN, SR.,
*Appellant.*

SYLLABUS BY THE COURT

1.

Police are free to interview a suspect who is in custody after the suspect waives *Miranda* rights. But if a suspect invokes one or more of those rights, such as the right to counsel, an interview must end. A suspect is not subject to further questioning until counsel has been made available—unless the suspect initiates further communication, exchanges, or conversations with police.

2.

To determine whether a suspect waived a previously asserted right to counsel, a court must determine the suspect: (a) initiated further discussion with police and (b) knowingly and intelligently waived the previously asserted right.

3.

When challenged, the State must prove by a preponderance of the evidence that statements made in a custodial interview were voluntary. Voluntariness is assessed by examining the totality of the circumstances, including: (a) defendant's mental condition; (b) the manner and duration of the interview; (c) defendant's ability to communicate on request with the outside world; (d) defendant's age, intellect, and background; (e) the

1

officers' fairness in conducting the interview; and (f) defendant's fluency with the English language. Any one factor or a combination of factors may inevitably lead to a conclusion that under the totality of the circumstances a suspect's will was overborne and the statements were not a free and voluntary act.

4.

Whether a suspect should be re-*Mirandized* after a waiver is a question of law an appellate court resolves by considering the totality of the circumstances.

5.

The 2013 amendments made in K.S.A. 2013 Supp. 21-5402(d) and (e) eliminated lesser included offenses of felony murder and expressly provided for retroactive application to cases pending on appeal on and after its effective date. The amendment's retroactive application does not violate the federal Ex Post Facto Clause.

6.

There is no federal constitutional requirement that a jury be instructed on lesser included offenses not recognized as such by state law.

7.

Section 5 of the Kansas Constitution Bill of Rights, which declares, "The right of trial by jury shall be inviolate," applies no further than to give the right of such trial upon issues of fact so tried at common law.

8.

A defendant has a right under Section 5 of the Kansas Constitution Bill of Rights to have a jury determine his guilt of the charged crime in a felony prosecution. But

2

determining what further crimes upon which the jury should be instructed as lesser included offenses is a matter of law for the court.

9.

The elements constituting the crime of interference with law enforcement under K.S.A. 2015 Supp. 21-5904(a)(3) are: (a) an identified law enforcement officer carrying out some official duty, (b) defendant knowingly and willfully obstructing or opposing the officer, and (c) defendant knew or should have known the person opposed was a law enforcement officer.

10.

Under the facts of this case, the jury's finding that the 14-month-old child abuse victim was particularly vulnerable because of age was a substantial and compelling reason to impose upward departure sentences for child abuse convictions.

Appeal from Saline District Court; RENE S. YOUNG, judge. Opinion filed January 20, 2017. Affirmed.

*Peter Maharry*, of Kansas Appellate Defendant Office, argued the cause and was on the brief for appellant.

*Ellen H. Mitchell*, county attorney, argued the cause, and *Derek Schmidt*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Antonio Brown was convicted of felony murder, two counts of child abuse, and one count of interference with a law enforcement officer. Brown argues his convictions must be reversed because (1) the district court admitted statements he gave to

3

police after he claimed he invoked his right to counsel and the statements were involuntary; (2) the district court failed to give lesser included offense instructions on the felony-murder charge; and (3) the evidence was insufficient to sustain his conviction of interference with a law enforcement officer. Brown further challenges the upward departure sentences imposed for the two child abuse convictions, arguing they were not justified by substantial and compelling reasons. We affirm.

We hold Brown reinitiated his interview with police after his unsuccessful attempt to contact a lawyer and in doing so knowingly and intelligently waived his previously-invoked right to counsel. Brown's subsequent inculpatory statements were freely and voluntarily given.

We hold further that the district court properly refused to give lesser included offense instructions for the felony-murder charge. See K.S.A. 2015 Supp. 21-5402(d), (e) (no lesser included offenses of felony murder; provision retroactive to all pending cases); *State v. Love*, No. 112,611, this day decided (statutory elimination of lesser included offenses of felony murder does not violate due process or the right to jury trial as guaranteed by Section 5 of the Kansas Constitution Bill of Rights); *State v. Todd*, 299 Kan. 263, 277-79, 323 P.3d 829 (2014) (retroactive abolition of lesser included offenses does not violate Ex Post Facto Clause).

We hold there was sufficient evidence to support Brown's conviction of interference with a law enforcement officer, based upon his failure to come out from hiding in a basement when instructed to do so by police.

Finally, under the facts of this case, we hold there were substantial and compelling reasons to impose upward departure sentences for the child abuse convictions because a 14-month-old victim was particularly vulnerable due to his age.

4

Beginning in late September 2011, Brown cared for 14-month-old Clayden Urbanek, while the child's mother, Brittney Betzold, was at work.

On October 4, Brown called Betzold's workplace and asked to talk to her about Clayden. The person who took the call said Brown seemed panicked and emotional. When Betzold arrived home, she found Clayden in a bedroom. He was awake but could not move his legs or arms. Brown told her Clayden took a hard fall from the couch and got a concussion. When Betzold said she was going to call 911, Brown left the house. He later called Clayden's father and volunteered that he did not hit Clayden and would never harm him.

When emergency personnel arrived, they found Clayden extremely pale with a distended abdomen, no pulse, and not breathing. Emergency room physicians transferred him to Wichita, where he underwent surgery for his abdominal injuries. He died shortly after the procedure.

Due to the extensive injuries, police investigated and charged Brown with felony murder, two counts of child abuse, and one count of interference with a law enforcement officer. The first child abuse charge related to incidents alleged to have occurred between September 26 and October 3, 2011. The second for incidents alleged on October 4. Brown was tried and convicted of all charges.

At a separate sentencing hearing, the jury found unanimously and beyond a reasonable doubt that there were aggravating factors associated with the child abuse charges. The jury returned verdicts finding four aggravating factors for the first count and

three for the second. Based on those findings, the district court imposed departure sentences of double the presumptive sentences for each child abuse conviction. This is Brown's direct appeal.

Jurisdiction is proper. See K.S.A. 2015 Supp. 22-3601(b)(3)-(4) (life sentence imposed; defendant convicted of off-grid crime).

BROWN'S STATEMENTS TO POLICE

Brown argues inculpatory statements he made to police should have been suppressed because he claims: (1) The officers violated his *Miranda* rights by failing to honor his request for counsel, (2) the statements were not voluntary, and (3) officers failed to read him the *Miranda* rights after every break in the questioning. The district court denied a motion to suppress prior to trial. We agree with the district court.

*Additional facts*

Police took Brown into custody around 7 p.m. on October 4, 2011. At about 8 p.m., two investigators began a recorded interview. Brown read, initialed, and signed a form, confirming that he understood he had the right to remain silent, that his statements could be used against him in court, that he had a right to have an attorney present, and that an attorney would be appointed for him if he could not afford one. While he was completing the form, Brown asked about the right to counsel.

He said he had a lawyer in a prior case but did not know if that person was still his lawyer or if the lawyer should be present. Brown asked if he could call his roommate to have him get in touch with the lawyer to see if Brown needed to have an attorney present for the questioning. An investigator told Brown they would discuss that after finishing the

6

waiver form. Brown responded it did not matter because he would still talk to the officers.

As the investigators were witnessing the form's execution, Brown again volunteered, "Actually it doesn't matter because I have nothing to hide." An investigator began to respond, "Well I want to clarify a couple of . . . ."

The remainder of this sentence and any response appear to be edited from the video included with the appellate record because the video immediately jumps to the following exchange:

"Brown: I can't afford an attorney right now.

"Investigator #1: OK.

"Brown: Well I don't have the money in my pocket but my roommate, you know, he's been helping me, you know, on my last case. He was involved in it. But he helps me kind of financially, you know, to help with my lawyer. And he would, you know, we both have the same lawyer and that's the only reason I need to, you know, ask him.

"Investigator #1: I understand that. Can't really go through that route. What I could do is I can afford you the opportunity for a phone book and a phone to be able to call but going through your roommate is not going to happen.

"Brown: How about my fiancé?

"Investigator #1: That I can't do.

"Brown: That's fine. That's fine. Like I said I'm not worried about it.

7

"Investigator #1: OK. But I can afford you the opportunity to you know call your attorney via the phone I have no problems with that.

"Brown: Like I said I don't know if he's still my attorney well because I took off on parole you know and I don't know if that drops the whole fuckin' case? I mean I don't know?

"Investigator #2: We can't answer that for you.

"Brown: I mean I don't know. Do you mind if I call him? You guys can sit here and . . . .

"Investigator #1: Yeah, go right ahead.

"Brown: Like I said I don't have nothing to hide so it don't matter to me. So but . . . .

"Investigator #1: Yeah, go right ahead."

Both investigators assisted Brown in locating the attorney's telephone number. Brown tried unsuccessfully to reach the attorney at two different numbers. The following exchange then occurred:

"Investigator #1: No answer?

"Brown: No [inaudible].

"Investigator #1: Well, um . . . .

"Brown: Um I understand what's going on. You know what I'm saying. I understand fully what's going on.

8

"Investigator #1:  Right. OK.

"Brown:  You know I mean this . . . .

"Investigator #2:  Our goal is to figure out the situation.

"Brown:  Yeah. I'll—I'll—I'll talk . . . .

"Investigator #1:  Without the presence of attorneys?

"Brown:  Yes sir, yes sir, yes sir. Like I said I have nothing to hide, you know.

"Investigator #1:  OK."

The investigators proceeded to interview Brown until about 2 a.m., during which time he made incriminating statements. He admitted he was the only person watching Clayden during the day for the last week and a half. He conceded he had a bad temper, was strict, and a little mean. But he also said he would not hurt Clayden. He disclosed he had been upset with the child, but not to the point of hurting him, and sometimes grabbed him in a way that scared Betzold. He admitted spanking the child with a wooden paddle the Friday before the child died because he was not listening to Betzold, being "obnoxious," and getting into everything. He said he knew he had put bruises on Clayden's buttocks.

Brown told investigators Clayden's fatal injuries happened when he fell off the couch and hit his head on the carpet. But he insisted he did not kill the child and denied hitting him on the head, face, or stomach. He said he did not know what happened to Clayden's stomach. Brown could not explain the injuries when confronted with the investigators' claim they could not have been caused by a fall. He admitted only he or Betzold could have killed the child and conceded the circumstances did not look good for

9

him, while maintaining he did not do it. At one point, Brown said his answers "probably seem[] like some bullshit."

Brown also admitted he was aware of the bruises on Clayden's face, buttocks, and side. But he offered innocent explanations for some, *e.g.*, the child fell and hit his head on a baby wipe container, or Brown squeezed his mouth to retrieve objects the child had put in it. Brown said he took a video of Clayden playing and tripping so Betzold could see he did not treat Clayden "like shit," but accidentally deleted it. He also made disparaging remarks about the child, *e.g.*, he was an "obnoxious little guy" and acted like a "little asshole."

Brown had been in custody for about seven hours when the interview ended, although the interview itself lasted about six hours with three 15-35 minute breaks. Investigators provided Brown with water and coffee but no food because Brown said he had eaten earlier. They let Brown use the restroom. Investigators did not smell alcohol on Brown and said Brown did not fall asleep or nod off during questioning and appeared to understand the questions and answer them appropriately. Brown was 27 years old at the time and had been previously arrested numerous times. An investigator admitted he was unsure whether Brown graduated high school. Brown became emotional at times during the interview but never asked to stop the questioning.

Brown moved to suppress the interview on the grounds he now raises on appeal. Following an evidentiary hearing and a review of the interview video, the district court addressed each basis asserted to support suppression and denied the motion. At trial, Brown preserved his arguments by timely objecting to his interview's audio recording.

*Standard of review*

On review of a district court's decision on a motion to suppress, factual findings are reviewed for substantial competent evidence. Legal conclusions drawn from those facts are reviewed de novo. See *State v. Cline*, 295 Kan. 104, 113, 283 P.3d 194 (2012) (reviewing trial court's decision that interview statement was made freely, voluntarily, and intelligently); *State v Appleby*, 289 Kan. 1017, 1038, 221 P.3d 525 (2009) (reviewing trial court's conclusion that defendant failed to invoke right to attorney for assistance in custodial interview).

*Alleged denial of right to counsel*

Police are free to interview a suspect who is in custody after the suspect waives *Miranda* rights. See *Davis v. United States*, 512 U.S. 452, 458, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). But if the suspect invokes one or more of those rights, such as the right to counsel, the interview must end. A suspect who has invoked the right to counsel is not subject to further questioning until counsel has been made available—unless the suspect initiates further communication, exchanges, or conversations with the police. 512 U.S. at 458 (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 [1981]); see also *State v. Walker*, 276 Kan. 939, 946, 80 P.3d 1132 (2003).

In their briefs, the parties appear to agree Brown invoked the right to counsel when he asked to call his lawyer. But at oral arguments, the State maintained Brown did not invoke the right to counsel. We do not believe this position has merit. Brown unequivocally expressed his desire for the assistance of counsel when he attempted to call an attorney from the interview room after receiving the *Miranda* warnings. See *Abela v. Martin*, 380 F.3d 915, 926 (6th Cir. 2004) (suspect invoked right to counsel by telling officers "maybe I should talk to an attorney by the name of William Evans," and showing

11

them the attorney's business card); *United States v. de la Jara*, 973 F.2d 746, 752 (9th Cir. 1992) (suspect invoked right to counsel by asking to call his attorney); *United States v. Porter*, 764 F.2d 1, 6 (1st Cir. 1985) (suspect invoked right to counsel when, upon being given opportunity to make a telephone call, suspect called information to get lawyer's number then called lawyer).

The district court's ruling on this point is a little unclear because it noted Brown asked to contact an attorney who was representing him in another matter and found Brown "did not make an unequivocal request for counsel." To avoid mischaracterization, we quote the district court's ruling:

> "The court finds based upon the testimony of the officers and reviewing the videotape, that Mr. Brown was read his *Miranda* rights in the room prior to the interview. He was read those rights by [an investigator]. He then asked that the defendant read the first line of the *Miranda* rights form. And after he demonstrated [ ] that he could read, [an investigator] asked to read—read the remainder of that form and sign and initial, which the defendant did.

> "The defendant did ask to call a friend to see whether he needed an attorney or to get in contact with an attorney. That was not permitted by the officers.

> "The defendant did ask to contact Roger Struble who, apparently, represented him in another matter. And at that time the questioning stopped with the exception there was one question asking the defendant the name of his roommate. [The investigators] looked up Roger Struble's telephone number and that telephone number was provided to the defendant and the defendant was provided access to a telephone and the defendant was given the opportunity to attempt to contact Roger Struble who, apparently, was not available. He was then given the number—the 1-800 number to contact his attorney Roger Struble and, apparently, was unable to get in contact with Mr. Struble through a 1-800 number. After not being able to contact Roger Struble, the defendant then reinitiated contact with the officers, and the videotape demonstrated that the decision to reinitiate

12

contact was defendant's decision. Neither officer pressured him, coerced him, or threatened him into speaking to them. And the defendant stated that he had nothing to hide, and the defendant began speaking to the officers. During the course of the entire interview the defendant at no additional time invoked his right to counsel or asked to terminate the interview.

"And the court finds that the defendant did not make an unequivocal request for counsel. And that after he did initially indicate that he asked to speak with Roger Struble, he chose to reinitiate contact with law enforcement, so the court is going to find that the defendant was not deprived of his Sixth Amendment Constitutional right to counsel."

It is clear to us that, despite the mention of an unequivocal request for counsel, the district court ultimately viewed the circumstances correctly and focused on the real question—whether Brown reinitiated the questioning.

To determine whether a suspect to whom a lawyer has not been made available has waived a previously-asserted right to counsel, a court must determine "whether the accused (1) initiated further discussions with police and (2) knowingly and intelligently waived the previously asserted right." *Walker*, 276 Kan. at 947; see *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983). The parties' arguments focus on the first prong of the test—whether Brown initiated the post-invocation conversation with the investigators.

A suspect who previously invoked his right to counsel initiates further conversation about an investigation when his statements can be "fairly said to represent a desire . . . to open up a more generalized discussion relating directly or indirectly to the investigation." *Bradshaw*, 462 U.S. at 1045. On the other hand, "inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word

13

was used in *Edwards*." 462 U.S. at 1045. Moreover, "a valid[, post-request] waiver cannot be established by showing only that [the suspect] responded to further police-initiated custodial interrogation . . . ." *Edwards*, 451 U.S. at 484. Whether a suspect's statement indicated a desire to reinitiate discussion turns on "both the content and context" of the statement when "viewed from the perspective of a reasonable officer . . . ." *United States v. Straker*, 800 F.3d 570, 623 (D.C. Cir. 2015).

As shown in the quoted interview extract, after Brown unsuccessfully attempted to contact Struble, he immediately indicated he understood "fully" his rights and the interview protocol, would talk without an attorney present, and had "nothing to hide." Viewing this in light of Brown's numerous declarations that it did not matter if he reached the attorney, we hold that Brown reinitiated the questioning and in doing so knowingly and intelligently waived the previously-asserted right to counsel.

*Voluntariness of the statements*

Brown next argues his statements must be suppressed because they were involuntary. The district court addressed each relevant factor associated with voluntariness and denied suppression. It stated, "after considering the totality of the circumstances, [the court] finds that the defendant's statements made—were freely and voluntarily made and the product of his own free will."

When challenged, the State must prove by a preponderance of the evidence that statements made in a custodial interview were voluntary. See *State v. Betancourt*, 301 Kan. 282, 290, 342 P.3d 916 (2015). Voluntariness is assessed by examining the totality of the circumstances, including:  (1) defendant's mental condition; (2) the manner and duration of the interview; (3) defendant's ability to communicate on request with the outside world; (4) defendant's age, intellect and background; (5) the officers' fairness in

14

conducting the interview; and (6) defendant's fluency with the English language. "Any one factor or a combination of factors 'may inevitably lead to a conclusion that under the totality of the circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act.'" 301 Kan. at 290.

There is little to support Brown's claim. The officers permitted him to communicate with the outside world by allowing him to call an attorney and helping him with that process. Though information on Brown's education is not in the record, he was 27 years old at the time. He is fluent in English. He appeared on the interview recordings and to the officers to understand the questions asked and gave appropriate answers. He had prior experience with police, having been arrested a considerable number of times. There is no claim officers made any promises or threats.

Brown focuses on three factors: his own mental condition, the officers' fairness, and the interview's manner and duration. He argues the district court failed to give appropriate weight to the fact the officers asked emotionally charged questions and the interview's length. As to Brown's mental state and the officers' fairness, Brown argues he was "in tears" at times and "very emotional." He contends the officers appealed to his sentiments by using "emotionally charged questions" when accusing Brown of wrongdoing and lying; asking him if Clayden's father deserved an explanation about what happened; showing him pictures of the child; and telling him Clayden was dead and "not coming back."

Showing the victim's photographs to a suspect "'is not inherently coercive police conduct.'" *United States v. Sanchez*, 614 F.3d 876, 885 (8th Cir. 2010). Nor is urging a suspect to tell the truth. *State v. Brown*, 285 Kan. 261, 276, 173 P.3d 612 (2007). Importantly, Brown does not direct our attention to any caselaw supporting his argument

15

that the officers' actions were coercive or that his reaction renders his statements involuntary.

In our 2007 *Brown* decision, defendant was charged with first-degree murder after a gang dispute and his conviction was supported by a confession. In determining whether the confession was voluntary, the court considered "emotional pressure" placed on defendant by asking him whether he wanted officers to tell his son he put a gang before him, and by telling him he was hurting his mother and his son by continuing to deny involvement. 285 Kan. at 275-76. The court construed the officers' statements as "basically asking [defendant] to tell the truth." 285 Kan. at 276. It explained the difference between permissible exhortations to tell the truth and coercive ones:

> """"If [an extrajudicial confession] has been extorted by fear or induced by hope of profit, benefit, or amelioration, it will be excluded as involuntary. However, the advice or admonition to the defendant to speak the truth, which does not import either a threat or benefit, will not make a following confession incompetent."'" [Citations omitted.]' *State v. Wakefield,* 267 Kan. 116, 128, 977 P.2d 941 (1999)." 285 Kan. at 276.

The *Brown* court concluded:  "The officers' statements regarding Brown's family were not an attempt to extort by fear; they were merely admonitions to be honest." 285 Kan. at 276.

As to emotional state, as challenged here, in *United States v. Duran*, 957 F.2d 499, 503 (7th Cir. 1992), the suspect's crying during the interview was insufficient to demonstrate the confession was involuntary "absent a showing that her emotional distress was so profound as to impair her capacity for self-determination or understanding of what the police were seeking." No such display has been made in this case either. Brown's emotional outbursts constitute a small portion of the interview and do not depict Brown so distraught as to be incapable of understanding of the circumstances.

16

In terms of the interview's length, Brown was questioned for about six hours over the course of a seven-hour detention. This court has held a confession voluntary when the defendant's interview lasted just under five hours over the course of a 12-hour detention, during which time defendant was handcuffed to a table. See *Brown*, 285 Kan. at 273-74. And we have held a confession to be voluntary when defendant was in the interview room for almost 13 hours and subjected to questioning for about eight hours. *State v. Walker*, 283 Kan. 587, 597, 153 P.3d 1257 (2007).

We hold the officers' conduct, Brown's emotional state, and the length of the detention and questioning did not render Brown's confession involuntary. His statements to investigators were voluntary under the totality of the circumstances.

*Renewed* Miranda *warnings*

Finally, Brown argues his statements should be suppressed because officers did not advise him of his *Miranda* rights after each break during the interview. He concedes this court has held this to be unnecessary. See *State v. Ransom*, 288 Kan. 697, 708, 207 P.3d 208 (2009) ("[W]e have no trouble concluding as a matter of law that it was unnecessary to re-*Mirandize* [defendant] at the beginning of each portion of his interview.").

Whether renewed *Miranda* warnings are necessary is a question of law this court answers by considering the totality of the circumstances. 288 Kan. at 706. One factor is "the time between the waiver and the statements sought to be suppressed." 288 Kan. at 706-07. The *Ransom* court held two breaks—one 25 minutes long and another 45 minutes long—"did not put the later portions of the interview outside a reasonable time" from the initial *Miranda* warnings. 288 Kan. at 708. In reaching this conclusion, the court cited an

17

earlier case, which in turn observed that courts have permitted lengthy gaps of several hours, five hours, 11 ½ hours, and even an entire day between *Miranda* warnings and the challenged statements. See 288 Kan. at 707-08; *State v. Mattox*, 280 Kan. 473, 487-88, 124 P.3d 6 (2005). But Brown argues because *Miranda* warnings serve such an important purpose, they should be given after every break as a matter of course. This court has rejected this argument:

> "'[O]nce the mandate of *Miranda* is complied with at the threshold of the interrogation by law enforcement officers, the warnings need not be repeated at the beginning of each successive interview. To adopt an automatic second warning system would be to add a perfunctory ritual to police procedures rather than provide the meaningful set of procedural safeguards envisioned by *Miranda*. [Citations omitted.]' *State v. Boyle,* 207 Kan. 833, 841, 486 P.2d 849 (1971)." *Mattox*, 280 Kan. at 488.

We hold that at no point between the initial *Miranda* warnings and the end of the interview did the length of time become unreasonable or otherwise make renewed warnings necessary.

## LESSER INCLUDED OFFENSES OF FELONY MURDER

Brown argues the district court erred in failing to instruct the jury on reckless and intentional second-degree murder as lesser included offenses of felony murder. The circumstances require additional explanation.

K.S.A. 2015 Supp. 21-5109(b)(1) and K.S.A. 2015 Supp. 21-5402(d) would have prohibited giving Brown's requested instruction because by statute there are no lesser degrees of felony murder, although those statutes were not in effect when Brown committed his crimes. K.S.A. 2015 Supp. 21-5402(e) provides that the rule applies retroactively to matters pending when it was adopted—a class of cases to which Brown's

case belongs. He argues that the statutes should not control because: (1) retroactive application of K.S.A. 2015 Supp. 21-5402(d) violates the Ex Post Facto Clause; (2) the statutory elimination of lesser included offenses for felony murder violates due process; and (3) the statutes infringe on his right to a jury trial under Section 5 of the Kansas Constitution Bill of Rights. Our caselaw has already addressed these arguments.

We rejected the Ex Post Facto claim in *State v. Todd*, 299 Kan. 263, 278-79, 323 P.3d 829 (2014). We continue to believe *Todd* correctly states the law and decline Brown's invitation to reverse it. See *State v. Love*, No. 112,611, this day decided.

Brown's arguments that elimination of lesser included offenses for felony murder violates due process and the right to a jury trial under Section 5 of the Kansas Constitution Bill of Rights also fail. We rejected identical challenges to the statutes in *Love*, slip op. at 26. Brown's federal due process claim fails because there is no federal constitutional requirement that the jury be instructed on offenses not recognized by state law as lesser included offenses. *Love*, slip op. at 23; *cf. Hopkins v. Reeves*, 524 U.S. 88, 99, 118 S. Ct. 1895, 141 L. Ed. 2d 76 (1988) (no constitutional error occurred when in prosecution for capital crime trial court did not instruct jury on a lesser crime that the state supreme court had previously held was not a lesser included offense of the charged crime under state law). And the state constitutional argument fails because Section 5 secures a criminal defendant the right to have a jury determine guilt of the charged offense, and it "'applies no further than to give the right of such trial upon issues of fact so tried at common law . . . .'" *Love*, slip op. at 25 (quoting *Hasty v. Pierpoint*, 146 Kan. 517, 519, 72 P.2d 69 [1937]). The challenged statutes do not infringe upon these rights because determining what additional crimes upon which the jury should be instructed as lesser included offenses is a matter of law for the court outside the scope of the jury's role as a factfinder. *Love*, slip op. at 26-27.

19

Because these constitutional attacks on K.S.A. 2015 Supp. 21-5109(b)(1) and K.S.A. 2015 Supp. 21-5402(d) fail, the instructions as given are deemed legally appropriate. Brown has failed to demonstrate any error with the jury instructions. See *State v. Plummer*, 295 Kan. 156, 162, 283 P.3d 202 (2012) (instructional error occurs when a district court refuses to give requested instruction that is legally appropriate and factually supported).

INTERFERENCE WITH LAW ENFORCEMENT

Brown next argues the evidence was insufficient to sustain his conviction for interference with law enforcement because it did not demonstrate he substantially hindered the officers.

*Additional facts*

Brown spent the afternoon of October 4 at Ana Heberly's house. When police arrived looking for Brown, Heberly let them in and said Brown was in the basement. Heberly's sister told officers Brown was in the crawl space or hiding behind a wall. Three officers entered the house. At the top of the basement stairs, an officer called out that they were Salina police and ordered Brown out of the basement.

When Brown did not emerge, officers went into the basement. They thought Brown was in an area not accessible to them, so one officer radioed for a K-9 unit, while another looked around. When an officer moved a piece of clothing, Brown announced he was there and would cooperate, and he emerged from behind a ledge. He was taken into custody.

20

To support the charge of interference with law enforcement, an officer testified they were in the basement a total of five to ten minutes. The K-9 unit never arrived. Another officer testified Brown's hiding slowed their effort to locate and arrest him. But the State did not claim the officers had a warrant to arrest Brown. Even though they commanded Brown to surrender, there was no evidence that they advised him they were there to arrest him, or that they were there on suspicion that Brown had committed any particular crime. See K.S.A. 22-2401(c)(1) (officer may arrest a person when the officer has probable cause to believe the person committed a felony).

The district court instructed the jury that it had to find: (1) The officers were "discharging official duty, namely investigating the abuse of a child and felony murder of [Clayden];" (2) Brown "knowingly obstructed, resisted, or opposed [the officers] in discharging that official duty;" (3) Brown's acts "substantially hindered or increased the burden of the officers in the performance of the officers' official duty;" and (4) Brown "knew or should have known [the officers] were law enforcement officers."

*Standard of review*

> """When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations." *State v. Lloyd,* 299 Kan. 620, 632, 325 P.3d 1122 (2014).' *State v. Woods,* 301 Kan. 852, 874, 348 P.3d 583 (2015)." *State v. Brown*, 303 Kan. 995, 1001, 368 P.3d 1101 (2016).

21

*Discussion*

>"Interference with law enforcement is . . . knowingly obstructing, resisting or opposing any person authorized by law to serve process in the service or execution or in the attempt to serve or execute any writ, warrant, process or order of a court, or in the discharge of any official duty." K.S.A. 2015 Supp. 21-5904(a)(3).

The offense's elements are: (1) an identified law enforcement officer carrying out some official duty; (2) "defendant knowingly and willfully obstructed or opposed [the] officer; and (3) "defendant knew or should have known the person he opposed was a law enforcement officer." *State v. Parker*, 236 Kan. 353, 364-65, 690 P.2d 1353 (1984). The question is whether the evidence established that Brown "obstructed or opposed" the officers.

"[W]hether there has been an obstruction of official duty must depend upon the particular facts of each case . . . ." 236 Kan. at 364. "'[T]o obstruct is to interpose obstacles or impediments, to hinder, impede or in any manner interrupt or prevent, and this term does not necessarily imply the employment of direct force, or the exercise of direct means.'" *State v. Lee*, 242 Kan. 38, 40, 744 P.2d 845 (1987). While actual force is not necessary, "[t]here must . . . be some actual overt act of obstruction." *Parker*, 236 Kan. at 360. The crime encompasses both physical acts and oral statements. 236 Kan. at 363.

>"'The statute does not limit the offense to resistance alone. It includes also willful acts of obstruction or opposition, and to obstruct is to interpose obstacles or impediments, to hinder, impede or in any manner interrupt or prevent, and this term does not necessarily imply the employment of direct force, or the exercise of direct means. It includes any passive, indirect or circuitous impediments to the service or execution of process; such as hindering or preventing an officer by not opening a door. It may be stated as a general rule that under statutes containing the words "obstruct, resist, or

oppose," or the single word "resist," the offense of resisting an officer can be committed without the employment of actual violence or direct force.'" 236 Kan. at 361 (quoting *State v. Merrifield*, 180 Kan. 267, 270-71, 303 P.2d 155 [1956]).

The defendant's act "must have substantially hindered or increased the burden of the officer in carrying out his official duty." 236 Kan. at 364.

"The principal purpose of criminalizing conduct that resists and obstructs officers in the performance of their duty is to protect officers from physical harm . . . . The statutes de-escalate the potential for violence which exists whenever a police officer encounters an individual in the line of duty, and the concern is not limited to the officer's safety but extends to all parties involved, including the prospective arrestee." 67 C.J.S., Obstructing Justice § 25.

Brown argues the State failed to put on evidence sufficient to demonstrate he substantially hindered the officers. He focuses solely on the fact that he remained hiding in the basement for only five to ten minutes before he surrendered himself to the officers. Brown relies entirely on *State v. Everest*, 45 Kan. App. 2d 923, 256 P.3d 890 (2011), for the proposition that "[s]ubstantial hindrance is more than a few minutes."

In *Everest*, defendant gave a false name during a traffic stop, so dispatch personnel were unable to locate records associated with defendant. The Court of Appeals held there was insufficient evidence to support conviction because the defendant's identity was quickly established when the officer discovered an identification card, which was "before [the] misidentification caused any substantial burden to [the officer]." 45 Kan. App. 2d at 930. The State distinguishes *Everest* on its facts, arguing that giving a false name is different from hiding and refusing to appear. We agree.

23

We have held a person could not be guilty of obstruction of official duty when she fled the crime scene and failed to turn herself in to police. See *Lee*, 242 Kan. 38, Syl. ¶ 2. In that situation, there was "no officer whose official duty [the person] could obstruct." See *Lee*, 242 Kan. at 42 (defendant's flight and failure to turn herself in occurred before she was under investigation or charged with a crime). And we have held a person could not be guilty of obstruction of official duty when she merely refused to assist an officer in the execution of process. See *State v. Hatfield*, 213 Kan. 832, 518 P.2d 389 (1974) (defendant, who was outside her home, did not comply with sheriff's request that she let him in to serve order of protective custody on child believed to be inside).

But in this case the evidence viewed in the light most favorable to the State shows Brown was hiding in the basement from officers who identified themselves and ordered him to come out. His failure to do so created an immediate safety issue for both the officers and Brown. And the officers had to engage in additional actions to address the heightened security concerns.

Given the limitations of our standard of review and the purpose underlying the interference with law enforcement statute, we hold under these circumstances a rational factfinder could have concluded Brown's failure to emerge from hiding when called by police substantially hindered the officers. The evidence supports the conviction.

AGGRAVATED SENTENCES FOR CHILD ABUSE

Brown next argues his upward departure sentences for child abuse were not supported by substantial and compelling reasons and that the aggravated sentencing statute is unconstitutionally vague. Because we conclude Clayden's vulnerability due to his young age was a substantial and compelling reason to impose departure sentences for these crimes, we affirm the sentences and need not reach Brown's vagueness claim.

24

*Additional facts*

Prior to trial, the State moved for departure sentences on both child abuse counts: the October 4 child abuse (Count 2), and the child abuse occurring between September 26 and October 3 (Count 4). During the penalty phase, both parties waived the opportunity to present additional evidence to the jury.

As to Count 2, the district court instructed the jury that the State alleged three aggravating factors:  (1) Clayden was particularly vulnerable due to age; (2) the crime involved a fiduciary relationship between Brown and the child; and (3) Brown failed to render aid as Clayden's medical condition declined. With regard to Count 4, the trial court instructed that the State alleged the same three aggravating factors, and, additionally, that Count 4 involved excessive brutality in a manner not normally present in the offense. The jury found the State proved beyond a reasonable doubt each factor associated with the respective counts.

At sentencing, Brown opposed upward departure, arguing he was already facing a lengthy prison sentence. The district court explained its departure decision on both counts together, stating:

> "[T]he court finds that there are substantial and—substantial and compelling reasons for granting an upward durational departure based upon the following aggravating factors which were unanimously found by the jury to have been proven beyond a reasonable doubt:  The first is that Clayden Urbanek was particularly vulnerable due to his age or reduced physical or mental capacity which was known or should have been known to the defendant. The court notes Clayden was 14 months old at the time of his death and the time that these offenses were committed. Secondly, the defendant's conduct during the commission of the current offense manifested excessive brutality to Clayden in a manner

not normally present for that offense. The court notes that the medical testimony from the trial was that Clayden had bruises all over his body; he had been beaten so badly on the buttock that the tissue had died; and had he survived his injuries, he would have required skin grafting; and he had been struck so forcefully in his abdomen that he suffered extensive internal injuries that resulted in his death. Third, the offense involved a fiduciary relationship which existed between the defendant and Clayden Urbanek. The court finds that the defendant was providing child care for Clayden while Brittney Betzold worked at Tony's to support herself, Clayden, and the defendant. Fourth, the defendant failed to render aid to Clayden as his medical condition declined. As to this factor the court notes the defendant recognized that Clayden was extremely ill when he called Brittney to come home from work on the morning of his death, yet he did not seek medical attention for Clayden. After Brittney returned home, he convinced Brittney not to seek medical attention and EMS was not called until after Clayden had stopped breathing. And so the court does find these are substantial and compelling reasons to grant an upward durational departure in this case. *And that relates to Counts 2 and 4*." (Emphasis added.)

For Count 2, the court sentenced Brown to 120 months' imprisonment. This was double the aggravated grid-block sentence for Brown's criminal history score. For the Count 4, the court sentenced Brown to 68 months' imprisonment, which was double the aggravated grid-block sentence with no criminal history score applied. The court ran these sentences consecutive to each other and the sentences for felony murder and interference with a law enforcement officer.

*Standard of review*

A sentencing judge must impose the presumptive sentence in the applicable KSGA grid-box, "unless the judge finds substantial and compelling reasons to impose a departure sentence." K.S.A. 2015 Supp. 21-6815(a). The standard of review for departure decisions depends on the issue presented.

When an issue is whether the record supports an articulated reason for departing, the court reviews for substantial competent evidence. When an issue is whether a "factor can 'ever, as a matter of law, be substantial and compelling in *any* case,'" review is unlimited. *State v. Bird*, 298 Kan. 393, 397-98, 312 P.3d 1265 (2013). The court also has unlimited review of whether "'the reasons, as a whole, [are] substantial and compelling reasons for departure in a given case.'" *State v. Martin*, 285 Kan. 735, 739, 175 P.3d 832 (2008).

A departure sentence should be upheld when even one factor relied upon by the sentencing court is substantial and compelling. Moreover, the individual factors need not be sufficient on their own to justify departure, so long as the factors collectively constitute a substantial and compelling basis for departure. *Bird*, 298 Kan. at 398.

*Preservation*

Brown suggests there may be a preservation issue because he did not argue to the district court that there were not substantial and compelling reasons to depart, even though he argued departure was unwarranted. See Kansas Supreme Court Rule 6.02(a)(5) (2015 Kan. Ct. R. Annot. 41) (brief must contain reference to location in record where issue raised and ruled upon). The State did not respond to this.

A departure sentence is subject to appeal. K.S.A. 2015 Supp. 21-6820(a). And given the State's failure to argue why Brown should be precluded from arguing on appeal that the departure sentences were not authorized, we will reach the merits.

*Count 2:  October 4 child abuse*

When imposing the departure sentence for Count 2, the district court relied on four factors, even though the jury was only presented and found three. Excessive brutality was not an aggravating fact submitted to the jury, so it cannot be a proper basis for departure for the October 4 child abuse conviction. See K.S.A. 2015 Supp. 21-6815(b) ("[A]ny fact that would increase the penalty for a crime beyond the statutory maximum, other than a prior conviction, shall be submitted to a jury and proved beyond a reasonable doubt."). But this error is harmless because the departure for this count is supported by another factor:  the child was particularly vulnerable due to his age.

Under K.S.A. 2015 Supp. 21-6815(c)(2)(A), when determining whether substantial and compelling reasons for departure exist, a court may consider whether "[t]he victim was particularly vulnerable due to age, infirmity, or reduced physical or mental capacity which was known or should have been known to the offender." But K.S.A. 2015 Supp. 21-6815(c)(3) provides:

> "If a factual aspect of a crime is a statutory element of the crime or is used to subclassify the crime on the crime severity scale, that aspect of the current crime of conviction may be used as an aggravating or mitigating factor only if the criminal conduct constituting that aspect of the current crime of conviction is significantly different from the usual criminal conduct captured by the aspect of the crime."

Brown argues we should not consider this factor as a sufficient justification for departure because age is an element of the child abuse offense.

In *State v. Salcido-Corral*, 262 Kan. 392, 940 P.2d 11 (1997), on which Brown relies, the court vacated upward departure sentences imposed for convictions of aggravated indecent liberties and aggravated criminal sodomy—both of which require as

an element that the victim be under 14 years old. The departures were imposed based on the seven-year-old victim's young age. The *Salcido-Corral* court held because the victim's young age was an element of the crimes of conviction, the victim's vulnerability due to age was an improper aggravating factor without evidence the victim was any more vulnerable than any other child of her age would be. 262 Kan. at 415.

We have not extended *Salcido-Corral* to other scenarios in which a child's age is both an element of the offense and a factor relied on to impose a departure, although it was mentioned in passing in another case. See *State v. Gould*, 271 Kan. 394, 413, 23 P.3d 801 (2001) ("We question, but need not decide, if the tender age of the children here qualifies as an aggravating factor for an upward departure, since age is an element of child abuse . . . .").

The State directs our attention to two cases that the Court of Appeals held the sentencing court did not err in imposing upward departure sentences based on the victims' vulnerability due to age. They are *State v. Peterson*, 25 Kan. App. 2d 354, 357, 964 P.2d 695 (1998), and *State v. Leonard*, No. 104,646, 2011 WL 5833375, at *3 (Kan. App. 2011) (unpublished opinion). But these are distinguishable because the victims' ages were not an element of the crimes for which the departure sentences were imposed. *Peterson*, 25 Kan. App. 2d at 355 (robbery and aggravated burglary); *Leonard*, 2011 WL 5833375, at *1 (theft).

The State also argues we should consider whether in some factual situations, the victim's age may be a factor for departure when compared to the age of others within the age range protected by the statute, but does not support this argument with any authority. Even so, the argument has merit under the circumstances because the 14-month-old victim was particularly vulnerable to abuse as compared to other child victims, whose

ages can range as high as 17 years old. See K.S.A. 2015 Supp. 21-5602(a) (any child under the age of 18 years).

In *State v. Mohamed*, 779 N.W.2d 93 (Minn. App. 2010), the Minnesota Court of Appeals held a child abuse victim's infancy could be used as an aggravating factor under that state's similar aggravated sentencing scheme, even though the victim's age was also an element of the crime. The court explained:

> "The legislature has taken the victim's age into account to the extent that it recognizes the special vulnerability of those under the age of 18. But we hold that, given the broad spectrum of physical development captured in this 18-year time span, the legislature's recognition does not preclude consideration of the victim's infancy as an aggravating factor here. The age element in the statute does not account for the particular vulnerability of [the victim], an extremely young victim who, because of his early stage of development, is incapable of perceiving danger, fleeing or shielding himself from harm, seeking help, or reporting the abuse. Indeed, [the victim's] vulnerability is absolute. He is particularly vulnerable among the broad class of child victims who are covered by the statute." 779 N.W.2d at 98.

We find this reasoning persuasive. *Salcido-Corral* suggests vulnerability due to age "'significantly different from the usual criminal conduct captured by the aspect of the crime'" turn solely on the victim's particular vulnerability as compared to others his or her own age. 262 Kan. at 414-15. We clarify this is not the case. We hold Clayden's vulnerability due to his age compared to others within the range of ages encompassed by the statute could be an aggravating factor here.

This leads us to the next question as to whether vulnerability due to age was a substantial and compelling reason to impose a departure sentence. A reason for departure is "'substantial'" if it is "'real, not imagined, and of substance, not ephemeral.'" *Bird*, 298 Kan. at 397. It is "'compelling'" if it "'forces the court, by the facts of the case, to abandon

30

the status quo and venture beyond the sentence that it would ordinarily impose.'" 298 Kan. at 397.

> ""Reasons which may in one case justify departure may not in all cases justify a departure." [*State v. Grady* ], 258 Kan. at 83[, 900 P.2d 227 (1995)]. Rather, we must evaluate the offense of conviction, the defendant's criminal history, and the departure reason stated, as well as the purposes and principles of the Kansas Sentencing Guidelines. *State v. Tiffany,* 267 Kan. 495, 504-05, 986 P.2d 1064 (1999); *Grady,* 258 Kan. at 83.' [Citation omitted.]" *Martin*, 285 Kan. at 744.

"Since one of the purposes of the sentencing guidelines is to ensure uniformity in sentencing, departures should only be allowed in extraordinary cases." *State v. Eisele*, 262 Kan. 80, 90, 936 P.2d 742 (1997).

The district court found the victim's particular vulnerability due to age supported departure because Clayden was only 14 months old at the time of the crime. We hold in this case this was a substantial and compelling reason to impose an aggravated sentence.

*Count 4: Child abuse between September 26 and October 3*

As to Count 4, the district court imposed the upward departure based on four aggravating factors: (1) Clayden's vulnerability due to age; (2) the presence of excessive brutality in a manner not normally present for the offense; (3) Brown's fiduciary relationship; and (4) Brown's failure to render aid.

For the reasons set out above, Clayden's vulnerability was a substantial and compelling reason to justify departure on this count as well. And we note the excessive brutality of this crime would suffice independently as a reason to impose a departure sentence given that the extent of the child's injuries substantiate physical brutality well

beyond that minimally necessary to commit child abuse. See *State v. Cox*, 258 Kan. 557, 579, 908 P.2d 603 (1995). We hold there were substantial and compelling reasons to impose the aggravated sentence as to Count 4.

Based on these holdings, which rest on statutorily enumerated aggravating factors, we need not address Brown's argument that permitting a sentencing court to rely on nonenumerated aggravating factors renders K.S.A. 2015 Supp. 21-6815 unconstitutionally vague. "[A] party asserting vagueness 'cannot challenge the constitutionality of the statute on the grounds that the statute may conceivably be applied unconstitutionally in circumstances other than those before the court.'" *State v. Williams*, 299 Kan. 911, 919, 329 P.3d 400 (2014) (defendant lacked standing to challenge statute as unconstitutionally vague when his conduct clearly fell within statute); see also *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19, 130 S. Ct. 2705, 177 L. Ed. 2d 355 (2010) ("We consider whether a statute is vague as applied to the particular facts at issue, for '[a] [litigant] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'"); *Hearn v. City of Overland Park*, 244 Kan. 638, 639, 772 P.2d 758 (1989) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.").

Affirmed.